MAYOR AND CITY COUNCIL OF BALTIMORE ᴇᴛ
ᴀʟ. *v.* HELEN REBECCA FUGET.

[No. 67, October Term, 1932.]

*Decided March 20th, 1933.*

336

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*R. E. L. Marshall, City Solicitor,* and *Paul F. Due, Deputy City Solicitor,* for the appellants.

*Walter H. Buck* and *D. Heyward Hamilton, Jr.,* for the appellees.

PATTISON, J., delivered the opinion of the Court.

The appeal in this case is from an order of the Court of Common Pleas of Baltimore City in a mandamus proceeding, directing the appellants, the Mayor and City Council of Baltimore, the board of estimates, the board of supervisors of city charities, and the city comptroller, to comply with certain provisions of the Acts of 1929, ch. 401, as amended by the Acts of 1931, ch. 115, providing for what is therein designated as "Mothers' Relief".

To pass upon the question raised on this appeal, it will be necessary for us to give a brief history of the legislation on this subject, starting with the Act of 1916, ch. 670. The object and purpose of that act may be gathered or ascertained from its title, which is as follows:

"An Act to provide for the partial support of mothers whose husbands are dead, when such mothers have children under fourteen (14) years of age, and are residents of the City of Baltimore and State of Maryland, and of the County in which application for relief is made. And, also to provide for visitation, care and supervision of the family within the State of Maryland for whose benefit such support is provided and to promote home life for dependent children under the guidance and protection of the mother. And, also as to the Administration of this Act, amount of Payment, Eligibility, Investigation, Penalties and Reports. And, also

providing for the appointment of a Board of three members in Baltimore City, to be known as the Board for Mothers' Relief for Baltimore City, or for carrying out the provisions of this Act by the Board of Supervisors of City Charities of Baltimore City, and authorizing the County Commissioners of the Counties of this State to carry out the provisions of this Act in their respective Counties, and providing for the levying of a tax for carrying out the provisions of this Act."

Section 1 of the act created a board to be appointed by the mayor and to be known as the board for mothers' relief for Baltimore City, and fixed the salaries of the members of the board and of its employees. It also defined the duties and functions which the board was to perform, and clothed it with the necessary powers and authority. At the conclusion of this section it is said: "Provided, however, that instead of appointing the Board for Mothers' Relief of Baltimore City, as provided in this Section, the Mayor and City Council of Baltimore may, in its discretion, devolve the duties imposed by this Act upon said Board for Mothers' Relief upon the Supervisors of City Charities of Baltimore City."

By the fourth section of the act, the board was required to report its findings as to claims of applicants for relief to the Juvenile Court of Baltimore City; and in the fifth section it was provided that "if, upon the completion of the examination, provided for under Section 4 hereof, the Juvenile * * * Court * * * concludes that unless relief is granted, the mother will be unable to support and educate her children, and that they may become a public charge, it shall make an order directing that there shall be paid to the mother monthly, upon the first day of each month * * * by the City Comptroller" the amounts therein stated; and the "Board of Estimates and the Mayor and City Council of Baltimore * * * are authorized and directed to levy such tax, not exceeding one-tenth of a mill, as may be necessary and sufficient to carry out the provisions of this Act, or to provide for the same out of the proceeds of the general tax levy."

This act is codified as part of article 88A, title "State Aid and Charities," in Bagby's Annotated Code of 1924, subtitle "Mothers' Relief." It stood until repealed by the Acts of 1929, ch. 401, the title to which was as follows: "An Act to repeal Sections 21 to 31, inclusive, of Article 88A of the Annotated Code of Maryland (1924 Edition), title 'State Aid and Charities,' sub-title 'Mothers' Relief,' and to enact in lieu thereof seven new sections to be known as Sections 21 to 27, inclusive, to provide for the relief of indigent widows in order to prevent their being separated from their children."

The changes made by this amendatory act, so far as we need to refer to them in the decision of this case, are: (1) The abolition of the board for mothers' relief and the transfer of the duties imposed upon them to the board of city charities for Baltimore City, who were, under the act of 1916, to perform such duties if, in the discretion of the mayor and city council, no appointment was made of the board for mothers' relief; and (2) the services of the juvenile court were eliminated; and (3) the taxes to be levied were increased from one-tenth of a mill to one-quarter of one cent on each $100 of assessable property.

The Act of 1929, ch. 401, was repealed by the Act of 1931, ch. 115, the title to which is as follows: "An Act to repeal and re-enact, with amendments, Sections 21 and 22 of Article 88A of the Annotated Code of Maryland (1929 Supplement), title 'State Aid and Charities,' sub-title 'Mothers' Relief,' to provide for the relief of indigent mothers in order to prevent their being separated from their children, and authorizing an increase in the levy therefor."

The effect of the amendatory Act of 1931, ch. 115, with the exception of a few minor and unimportant changes, was to increase the taxes to be levied from one-quarter of one cent to one cent on each $100 of assessable property in the city.

With the general statement herein made of the contents of the three acts mentioned, we, in the decision of this case, need only set out sections 21 and 22 of the Acts of 1929, ch.

401, as amended by the later Act of 1931, ch. 115, which are as follows:

"21. Any mother of a child or children under the age of fourteen (14) years, whose husband is dead or permanently incapacitated, and who is unable to support it or them and maintain her home, may present a written application or petition for relief to the County Commissioners of the county wherein she resides, or to the Supervisors of City Charities of Baltimore City. Such application or petition shall be verified in such manner and shall contain such information as the said County Commissioners or Supervisors of City Charities of Baltimore City may prescribe.

"The child or children for whose benefit the relief is granted must be living with the mother of such child or children. The relief shall be granted only, when, in the absence of such relief, the mother would be required to work regularly away from her home and children, and when, by means of such relief she will be able to remain at home with her children, except, that she may be absent for work a definite number of days each week, to be specified in the order giving relief, when such work can be done by her without the sacrifice of health or the neglect of home and children.

"A mother shall not receive such relief who has not resided in the county where the application is made, or in the City of Baltimore, at least three years before making such application. Whenever any child shall arrive at the age of fourteen (14) years, the relief granted to the mother for such child shall cease; provided, that if a child of fourteen (14) years of age be ill or is incapacitated for work or is regularly attending school, the mother shall receive the funds for its care, during such illness or incapacity for work or during attendance at school, until such child is sixteen years of age. It shall be the duty of the Supervisors of City Charities of Baltimore City and the County Commissioners of the respective counties to investigate every application for relief made in Baltimore City or in any of the counties, respectively, to hear all witnesses for applicants and to carry out the provisions of this sub-title.

"22. If upon the completion of the investigation of any application as aforesaid, the said Supervisors of City Charities of Baltimore City or said County °Commissioners conclude that unless relief is granted, the mother applying will be unable to support and educate her children and that they may become a public charge, said County Commissioners shall pay or said Supervisors of City Charities shall order the City Comptroller of Baltimore City to pay out of the funds of Baltimore City, as the case may be, to the mother monthly on the first day of each month, such sum as they may deem sufficient to enable said mother to support and educate her children. The Board of Estimates and the Mayor and City Council of Baltimore and the County Commissioners of the respective counties of this State are authorized and directed to levy such taxes, not exceeding one cent on each one hundred dollars of assessable property, as may be necessary and sufficient to carry out the provisions of this sub-title, or to provide for the same out of the proceeds of the general taxes levied."

The appellants in their brief present three questions as to the validity of these acts, which are as follows:

(1) Do the acts of 1929 and 1931 violate the provisions of article XIA of the Constitution relating to the grant of home rule powers and privileges to Baltimore City?

(2) Are the titles of the acts of 1929 and 1931 defective within the meaning of article 3, section 29, of the Constitution?

(3) Do the acts of 1929 and 1931 violate article 3, section 59, of the Constitution prohibiting the establishment of any general pension system?

In addition thereto, the brief presents the further question:

(4) Was it competent for the lower court to issue its writ of mandamus in a form other than as prayed in the petition?

We will consider these questions in the order in which they are presented: First, whether the acts of 1929 and 1931

violate the provisions of article 11A of the Constitution. This article is known as the Home Rule Amendment, and was proposed by the Act of 1914, ch. 416, and ratified November, 1915.

The first section of this article in substance provides that "on demand of the Mayor of Baltimore and City Council of the City of Baltimore, or on petition bearing the signatures" of the required number of registered voters of said city or any county, the "Board of Election Supervisors of said City or County shall provide * * * for the election of a charter board" of the number therein stated to be elected in the manner therein particularly set forth; and the board, or a majority of them, when selected, shall prepare within the time stated "a charter or form of government for said city or such county and present the same to the Mayor of Baltimore or President of the Board of County Commissioners of such county," thereafter to be published at the time and in the manner stated and afterwards submitted to the voters of the city or county; and, "if a majority of the votes cast" shall be in favor of its adoption, the charter, after the time therein stated, "shall become the law of said City or County, subject only to the Constitution and Public General Laws of this State, and any public local laws inconsistent with the provisions of said charter and any former charter of said the City of Baltimore or County shall be thereby repealed."

Section 2 of this article provides that: "The General Assembly at its first session after the adoption of this amendment shall by public general law provide a grant of express powers for such county or counties as may thereafter form a charter under the provisions of this Article. Such express powers granted to the counties and the powers heretofore granted to the City of Baltimore, as set forth in Article 4, Section 6, Public Local Laws of Maryland, shall not be enlarged or extended by any charter formed under the provisions of this Article, but such powers may be extended, modified, amended or repealed by the General Assembly."

Section 4 of this article provides that: "From and after

the adoption of a charter under the provisions of this Article by the City of Baltimore or any county of this State, no public local law shall be enacted by the General Assembly for said city or county on any subject covered by express powers granted as above provided. Any law so drawn as to apply to two or more of the geographical subdivisions of this State shall not be deemed a Local Law, within the meaning of this Act. The term 'geographical subdivision' herein used shall be taken to mean the City of Baltimore or any of the counties of this State."

There are other sections in this article, but in the decision of this case they need not be set out herein.

The City of Baltimore availed itself of the opportunity of home rule afforded it under this amendment of the Constitution by the adoption in 1918 of a charter in accordance therewith (Code Pub. Loc. Laws 1930, art. 4, sec. 1 *et seq.*). The charter adopted by the city under the provision of the Constitution became the law of the city, "subject only to the Constitution and Public General Laws of this State." It repealed "any public local laws inconsistent with the provisions of said charter and any former charter" of the city (section 1); and the law as set forth therein is not to "be enlarged or extended by any charter formed under the provision of this Article, but such powers may be extended, modified, amended or repealed by the General Assembly" (section 2). It is further provided by said article of the Constitution that the city council, "subject to the Constitution and Public General Laws of this State, shall have full power to enact local laws of said City * * * including the power to repeal or amend local laws * * * enacted by the General Assembly, upon all matters covered by the express powers granted as above provided" (section 3). *State v. Stewart,* 152 Md. 419, 423, 137 A. 39.

If the Acts of 1916, ch. 670, codified in the Code of 1924, article 88A, sections 21 to 31, inclusive, title "State Aid and Charities," subtitle "Mothers' Relief," in force at the time of the adoption of the city charter in 1918, was a public general law, it was not repealed or affected by the adoption

thereafter of the charter, but remained in full force and effect until repealed by the Act of 1929, ch. 401.

The act of 1916 authorized and directed the board of estimates and the Mayor and City Council of Baltimore and the county commissioners of the respective counties of the state "to levy such tax, not exceeding one-tenth of a mill, as may be necessary and sufficient to carry out the provisions of this Act, or to provide for the same out of the proceeds of the general tax levy" (section 25).

The act provided for the creation of a board to be appointed by the mayor of Baltimore City, known as the mothers' relief, to administer the provisions of the act in Baltimore City, unless this duty, in the discretion of the mayor and city council, was imposed upon the supervisors of city charities of Baltimore City, an agency of the city under its then existing charter; while in the counties the county commissioners were named as the agency to administer the provisions of the act. The mayor and city council, in the exercise of its discretion, imposed the duty of the law's administration in Baltimore City upon the supervisors of city charities, and not upon a board for mothers' relief, which was never named. This act, the provisions of which applied to the entire state, was undoubtedly a public general law. *Lankford v. Somerset County,* 73 Md. 105, 20 A. 1017, 22 A. 412; *Herbert v. Baltimore County Commrs.,* 97 Md. 639, 55 A. 376; *Baltimore City v. Allegany County,* 99 Md. 1, 57 A. 632; *Prince George's County v. Balto. & O. R. Co.,* 113 Md. 179, 77 A. 433; *Gaither v. Jackson,* 147 Md. 655, 128 A. 769; *Grossfeld v. Baughman,* 148 Md. 330, 129 A. 370.

The act of 1916 was in force at the time of the adoption of the charter in 1918, and it remained in force for a long time thereafter, or until 1929. To this time the Legislature had not delegated to the city under the Home Rule Amendment the power to legislate upon the subject of mothers' relief, and the city had not acquired that right. The right to legislate thereon was still in the General Assembly of Maryland, and in recognition of that right the Legislature,

by the Acts of 1929, ch. 401, repealed the act of 1916, and re-enacted in lieu thereof provisions therein contained which for the most part differ but little from those contained in the earlier act. The only important changes therein were: (1) An increase in the rate of taxes to be levied; and (2) the mayor and city council were not, in their discretion, to determine whether the law should be administered by the board for mothers' relief or the supervisors of city charities, as in the earlier act, but this duty was imposed upon the latter, on whom the city had placed the burden under the act of 1916.

The Act of 1929, ch. 401, was amended by the Act of 1931, ch. 115, and the only material change made by that amendment was an increase in the rate of taxes to one per cent.

It is contended by the appellants that the act of 1929, as amended by the act of 1931, deprived the city of its rights acquired under the Home Rule Amendment to alone legislate upon the subject-matter of the act.

It is conceded by the city that the act is a public general law, so far as it required the city and the counties of the state to levy upon the property in their respective jurisdictions for the creation of a fund to be used in carrying out the purpose and object of the act; but it contends that it is a public local and not a public general law in respect to the agency to be used in the accomplishment of its object and purpose, inasmuch as the agency to be employed in the city differs from that in the counties. This contention of the city we cannot adopt. The substantial legislation contained in this act is the requirement that the city and the counties of the state shall levy upon the property in their respective jurisdictions for the creation of a fund to be used for the purpose and object therein stated.

The fact that the agency to be used in the city is different from the one to be employed in the counties, where government and other conditions differ, does not, we think, warrant the conclusion that the act of 1929 as amended is not a

public general law. This act names no new agency of the city; the agency designated by it is the agency named in the public general law of 1916, and we do not understand it to be the contention of the city that, at that time, an agency of the city could not have been properly designated by a public general law of the state as one by whom certain state duties were to be performed.

The subsequent acts of 1929 and 1931 were amendatory of the act of 1916, dealing with a subject-matter as to which no delegation of power to legislate thereon had been granted to the city, and the right of the Legislature to designate an agency of the city, exercised by it in the passage of the act of 1916, was continued to be exercised by the subsequent acts of 1929 and 1931. These acts, in our opinion, the provisions of which apply to all subdivisions of the state, are, like the act of 1916, public general laws within the meaning of the constitutional amendment, in which it is said: "Any law so drawn as to apply to two or more of the geographical subdivisions of this State shall not be deemed a Local Law, within the meaning of this act."

The second question presented is whether the titles of the acts of 1929 and 1931 are defective under the requirements of article 3, section 29, of the Constitution, where it is stated: "Every law enacted by the General Assembly shall embrace but one subject, and that shall be described in its title. * * *"

The object of this requirement of our Constitution is to prevent the practice of "engrafting, upon subjects of great public benefit and importance, for local or selfish purposes, foreign and often pernicious matters," *Davis v. State,* 7 Md. 151, 160; and "to exclude all foreign, irrelevant, or discordant matter from a statute, and to confine the statute to the single subject disclosed in the title." *Phinney v. Sheppard & Enoch Pratt Hospital,* 88 Md. 633, 636, 42 A. 58, 59; *Worcester County v. School Commrs.,* 113 Md. 305, 308, 77 A. 605.

In *Baltimore v. Stewart,* 92 Md. 535, 48 A. 165, 168,

Judge McSherry, speaking for the court, said: "It never has been understood that the title of a statute should disclose the details embodied in the act. It is intended simply to indicate the subject to which the statute relates."

In the Act of 1929, ch. 401, the act sought to be repealed and re-enacted with amendments is described by Code article and section designations giving the title "State Aid and Charities," sub-title "Mothers' Relief," and it further indicates the subject of the legislation by adding thereto: "To provide for the relief of indigent widows in order to prevent their being separated from their children."

The title to the Act of 1931, ch. 115, also describes the act sought to be repealed and re-enacted with amendments by Code article and section designations, with additions thereto as stated in the title of the Act of 1929, ch. 401; and with the further addition: "And authorizing an increase in the levy therefor."

This court, speaking through Judge Urner in *Dean v. Slacum,* 149 Md. 578, 580, 132 A. 73, 74, said: "It has been repeatedly decided that a correct title description of an act by Code article and section designations is a compliance with the constitutional requirement." *Todd v. City of Frostburg,* 141 Md. 693, 119 A. 696; *Key v. Key,* 134 Md. 418, 106 A. 744; *Ruggles v. State,* 120 Md. 553, 564, 87 A. 1080; *Worcester County v. School Commrs., supra; Kingan Packing Assn. v. Lloyd,* 110 Md. 619, 73 A. 887; *Anne Arundel County v. United Rwy. & Elec. Co.,* 109 Md. 377, 72 A. 542; *Barron v. Smith,* 108 Md. 317, 70 A. 225; *Himmel v. Eichengreen,* 107 Md. 610, 69 A. 511; *Garrison v. Hill,* 81 Md. 551, 32 A. 191; *Lankford v. Somerset County, supra; Second German-American Bldg. Assn. v. Newman,* 50 Md. 62.

There is, we think, no difficulty in holding the title of these acts to be sufficient. The objection urged against them arises from the fact that the acts are treated by the appellant as having the effect of repealing the powers granted by the Legislature to the City of Baltimore, and the argument is made thereon that the title should contain some reference

to the fact that the enactment was made to effect such result. The acts, as we have held, do not repeal any powers granted by the Legislature to the city. Consequently the objection urged against the sufficiency of the titles upon the grounds stated is without force or effect.

The third question presented by this appeal is: Do the Acts of 1929 and 1931 violate article 3, section 59, of the Constitution, prohibiting the establishment of any general pension system? This section of the Constitution provides that: "The office of 'State Pension Commissioner' is hereby abolished; and the Legislature shall pass no law creating such office, or establishing any general pension system within this State."

The office of "State Pension Commissioner," abolished by the above provision of the Constitution, was created only a few months before by the Act of 1867, ch. 385. This act provided for the annual appointment by the Governor of a "person in each Legislative District in the City of Baltimore and in each of the several counties in the State, to be styled 'State Pension Commissioners,'" who were authorized, upon application made to them by "a soldier of the war of eighteen hundred and twelve, or the widow of any such soldier for the benefit of the relief provided by this act," and, after careful examination of the merits of the case, and finding "that he or she is really in need of such assistance," to "certify the same to the Comptroller, and authorize the payment of a pension as has heretofore been done by a Resolution of the General Assembly."

The Constitution of 1867 was framed and adopted only a short time after the close of the war between the states, and at a time when the feeling engendered thereby still existed. In addition to the Act of 1867, ch. 385, other acts or resolutions had been passed by the Legislature providing pensions for Union soldiers of the Civil War. The granting by the State of these military pensions was opposed by a substantial number of the citizens of the state, and, upon the convening of the Constitutional Convention in 1867, this

feeling manifested itself in an order submitted to the Convention "that the committee on the militia report to the Convention the expediency of abolishing the office of State pension commissioner created by the Act of 1867, ch. 385, and of prohibiting the Legislature from establishing any general pension system in the State." When this order was offered, Mr. Isaac D. Jones, a member of the Convention from Somerset County, said "This act of the Assembly had opened the doors to the most enormous frauds that had ever been practiced upon the people of Maryland. He had suspected something of the kind when the bill was pending." Others expressed themselves as concurring in the views of Mr. Jones, and thought some action in this matter should be taken by the Convention. This order was afterwards adopted and became a part of the organic law of this state.

At that time all pensions other than military pensions were practically unknown. It was not until 1871 that the Congress of the United States "seriously considered the subject of reform in the civil service, and the creation of a force of permanent employees"; and the "payment of pensions to civil officers is a subject of more recent development." *State of Nebraska ex rel. Haberlan v. Love,* 89 Neb. 149, 131 N. W. 196, 199.

Since that time the Legislature has passed statutes providing for the granting of pensions to civil officers and to teachers of the public schools of this state, and many private corporations have adopted the system of retirement compensations to those who have served them for a fixed period of time. At the time when this order was submitted to the Convention and acted upon by it, military pensions were the only pensions to which their minds were thereby directed, the granting of which they apprehended would result in enormous frauds and wrongdoing. Other pensions that had not yet come into existence and to which their minds were necessarily not directed were not, we think, intended to be included within the prohibited class. The provision refers specifically to the "State Pension Commissioners," created under the Acts of 1867, ch. 385, whose duties were solely

confined to military pensions, and by the act such commissioners were abolished. It is true that in addition thereto the provision prohibits the Legislature from "establishing any general pension system in this State." In interpreting the meaning of this latter clause of the provision, it must be considered in connection with the first. The first clause of this provision abolished, as we have said, the office of "State Pension Commissioner" created by said act. It is evident that the Convention not only wished to abolish the system thereby created, but to prohibit the Legislature from again establishing that system or any other system in relation to military pensions by and through which the apprehended frauds might be committed. It was not, we think, the intention of the framers of the Constitution to include other pensions of an entirely different character not then in existence and which were at the time unknown to the members of the Convention.

To us it is clear that what is here attempted to be accomplished by the passage of the acts in question is not a pension within the meaning of this provision of the Constitution, nor is it even called a pension. The object and purpose of the act is to provide, in some cases, for the care and maintenance of dependent children at their homes "under the guidance of their mother," and not to commit them to an institution at possibly a greater cost to the State, thereby taking them from the care and control of their mother and the association of their brothers and sisters, if any, as well as depriving them of the environment of a home and subjecting them to the care of others who have not in them the interest of a mother. It is not a pension to the mother, nor is the act passed for the mother's benefit, except in so far as it enables her to enjoy the association of her children. But it is for the benefit and welfare of the children; and the aid or assistance afforded them by the act lasts only so long as the necessity therefor exists. It lacks the attributes of a pension.

The fourth question is: "Was it competent for the lower court to issue its writ of mandamus in a form other than as prayed in the petition?" As stated in the appellants' brief,

the appellee in her prayer for relief has asked "that the city be compelled to grant relief to all mothers who may come under the terms of the act, rather than to the number necessary to consume the entire appropriation of $116,345.87. It appears from the record that there are a greater number of mothers entitled to relief than can be granted relief under an appropriation of $116,345.87. The court, in granting relief, however, limited it to make up the difference between the amount actually granted of $45,000, and the amount of $116,345.87 which one cent upon the tax rate would produce, or $71,345.87. The appellants therefore contend that the writ could not issue because relief had not been granted as prayed."

The objection urged against the validity of the writ is that the relief sought was in excess of that granted, or that the relief granted was less than that asked for. The English rule, that the peremptory writ should be in strict conformity with the alternative writ, has been greatly relaxed by many of the courts of this country, though still adhered to by some.

As stated in *State ex rel. Brumley v. Jessup & Moore Paper Co.,* 1 Boyce (Del.) 379, 77 A. 16, 23: "It has been decided in some jurisdictions that the peremptory writ must follow in exact terms the alternative writ. * * * But practically all the text-writers agree, and the great weight of the modern decisions is, that a demand on the part of the relator for excessive relief does not preclude the granting of the relief to which the relator is entitled under the facts stated." *People ex rel. Central Pac. R. Co. v. Board of Supervisors,* 27 Cal. 655; *Commrs. of Highways of Town of Goshen v. Jackson,* 165 Ill. 17, 45 N. E. 1000; *Satterwhite v. State,* 142 Ind. 1, 40 N. E. 654, 1087. See, also, *State ex rel. Babcock v. Chisago County et al.,* 115 Minn. 6, 131 N. W. 792; *State v. Crites,* 48 Ohio St. 142, 26 N. E. 1052; *State ex rel. Hallett v. Seattle Lighting Company,* 60 Wash. 81, 110 P. 799.

The relief granted in this case differs from the relief sought only in the fact that the amount of relief granted is

less than that asked for. The character and form of the relief is the same.

The appellants in support of their contention cite the case of *Strott v. Broening,* 160 Md. 560, 154 A. 45, but we do not regard this case as analogous to and controlling in the case before us.

From the conclusions reached herein, the judgment of the trial court will be affirmed.

*Judgment affirmed, with costs.*

DIGGES and SLOAN, JJ., concur in the result.