PRESSMAN *v.* STATE TAX COMMISSION ET AL.

[No. 84, October Term, 1953.]

CITY OF BALTIMORE *v.* STATE TAX COMMISSION ET AL.

[No. 85, October Term, 1953.]

80

*Decided February 11, 1954.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

(In No. 84) *Hyman A. Pressman,* and (in No. 85) *Thomas N. Biddison, City Solicitor for Baltimore City,* with whom were *Edwin Harlan, Deputy City Solicitor* and *William H. Marshall, Assistant City Solicitor,* on the brief, for appellants.

*Francis D. Murnaghan, Jr., Assistant Attorney General,* with whom were *Edward D. E. Rollins, Attorney General* and *J. Edgar Harvey, Deputy Attorney General,* on the brief, for State Tax Commission and State officials, appellees.

*J. Kemp Bartlett, Jr.,* and *Richard W. Kieffer,* with whom were *Bartlett, Poe & Clagett, L. Vernon Miller* and *Frederick W. Brune,* on the brief, for the savings banks, appellees.

DELAPLAINE, J., delivered the opinion of the Court.

These two suits challenge the constitutionality of Chapter 783 of the Laws of Maryland of 1953, which amends the State Revenue and Tax Law by reducing the franchise tax on the mutual savings banks situated in this State. Code 1951, art. 81, sec. 126.

Both suits were filed in the Circuit Court of Baltimore City. One was filed by Hyman A. Pressman, a citizen and taxpayer of Baltimore, against the State Tax Commission, State Comptroller, and the savings banks. The other was filed by the Mayor and City Council of Baltimore against the State Tax Commission, State Comptroller, State Treasurer, Attorney General, and the savings banks.

Complainants prayed for a judicial declaration that the Act of 1953 is unconstitutional and for an injunction prohibiting the State Tax Commission, in calculating the amounts of the franchise taxes to be paid by the savings banks for 1954 and annually thereafter, from using a rate lower than that prescribed by the Revenue and Tax Law prior to the passage of the Act, *i.e.,* one-fourth of one per cent on the total amount of deposits.

In each case defendants demurred to the bill of complaint. Each appeal is from a decree sustaining the demurrers and dismissing the bill.

We consider at the outset the suggestion of defendants that declaratory judgment proceedings are not proper in these cases for the reason that a special form of remedy is provided for cases of this nature. They rely on the following provision of the Uniform Declaratory Judgments Act: "When, however, a statute provides a special form of remedy for a specific type of case, that statutory remedy must be followed; but the mere fact that an actual or threatened controversy is susceptible

of relief through a general common law remedy, or an equitable remedy, or an extraordinary legal remedy, whether such remedy is recognized or regulated by statute or not, shall not debar a party from the privilege of obtaining a declaratory judgment or decree in any case in which the other essentials to such relief are present; * * *." Code 1951, art. 31A, sec. 6.

It is true that the Revenue and Tax Law expressly provides that any taxpayer or any City, claiming to be aggrieved because of any final action taken by the State Tax Commission, in the exercise of its original jurisdiction in assessing any property or computing any tax, has the right to appeal to the Circuit Court of any County or the Circuit Court or Circuit Court No. 2 of Baltimore City, in which the property may be situated, or in which the taxpayer may reside or be taxable in respect thereto, or in which the office of the Commission may be situated. From the decision of the Court hearing such appeal, any party may take an appeal to the Court of Appeals. Code 1951, art. 81, sec. 255. Thus, in *Reiling v. Comptroller of Maryland,* 201 Md. 384, 94 A. 2d 261, where an employee of the Government in Washington, who maintained citizenship and domicile in the State of Illinois, but owned a home and resided in the State of Maryland, had been notified by the State Comptroller of the estimated assessment of Maryland income tax, it was held that his remedy was an appeal in the manner provided by the statute, and he could not maintain a suit for a declaratory decree and injunction.

It has long been the policy of the State of Maryland to disapprove of the by-passing of administrative action, especially where such action is within the expert knowledge of the administrative agency, except where there is a clear necessity for a prior judicial decision. However, before the Declaratory Judgments Act was passed by the Legislature of this State, Laws 1939, ch. 294, retail dealers were entitled to attack the constitutionality of

a gross receipts tax by a suit for an injunction. *Jones v. Gordy,* 169 Md. 173, 178, 180 A. 272.

Since 1939 the procedure of the Declaratory Judgments Act has been used many times to test the constitutionality of statutes and ordinances. It was used to attack the Unfair Sales Act. *Daniel Loughran Co. v. Lord Baltimore Candy & Tobacco Co.,* 178 Md. 38, 12 A. 2d 201. It was used to attack the Income Tax Law. *Oursler v. Tawes,* 178 Md. 471, 13 A. 2d 763. It was used to attack the statute regulating advertising by physicians and surgeons. *Davis v. State,* 183 Md. 385, 37 A. 2d 880. It was used to attack the act authorizing the regulation of private trade schools. *Schneider v. Pullen,* 198 Md. 64, 81 A. 2d 226. We repeat that where a statute provides a special form of remedy, the plaintiff must use such form rather than any other, but constitutional issues may be decided in an action for a declaratory judgment or decree or injunction if there is no by-passing of an administrative agency in a case calling for determination of facts within the sphere of the agency's expertness. *Commissioners of Cambridge v. Eastern Shore Public Service Co.,* 192 Md. 333, 64 A. 2d 151; *Francis v. MacGill,* 196 Md. 77, 75 A. 2d 91; *Kracke v. Weinberg,* 197 Md. 339, 79 A. 2d 387; *Schneider v. Pullen,* 198 Md. 64, 81 A. 2d 226; *Miller Bros. Co. v. State,* 201 Md. 535, 540, 95 A. 2d 286, 288; *Tanner v. McKeldin,* 202 Md. 569, 577, 97 A. 2d 449, 453.

We specifically hold that the constitutionality of a statute may be challenged in a declaratory judgment action on the ground that the title of the statute is not descriptive of the body, as required by the State Constitution. *State Budget Commission v. Adams,* 249 Ky. 680, 61 S. W. 2d 314; *Jefferson County Fiscal Court v. Thomas,* 279 Ky. 458, 130 S. W. 2d 60; *Gouge v. McInturff,* 169 Tenn. 678, 90 S. W. 2d 753; *Knoxville Housing Authority v. City of Knoxville,* 174 Tenn. 76, 123 S. W. 2d 1085; *Houston County Board of Revenue v. Poyner,* 236 Ala. 384, 182 So. 455; *Meara v. Brindley,*

207 Ind. 657, 194 N. E. 351; *Kindy Opticians, Inc. v. Michigan State Board of Examiners,* 291 Mich. 152, 289 N. W. 112; *Ziegler v. Pickett,* 46 Wyo. 283, 25 P. 2d 391; *Multnomah County v. First National Bank of Portland,* 151 Ore. 342, 50 P. 2d 129.

In the cases before us the complainant taxpayer and the City of Baltimore might have lost substantial rights if the Act which they challenged were unconstitutional, and they were required to wait for the action of the State Tax Commission and subsequent decisions of the Circuit Court and the Court of Appeals. We hold, therefore, that, in view of the desirability of having the question of constitutionality determined for the benefit of the members of the State Tax Commission and other State, City and County officials, as well as the savings banks and the taxpayers generally, the request for a declaratory decree was not inappropriate. It can readily be appreciated that a public official sometimes faces a dilemma either in refusing to act under a statute he believes to be unconstitutional, or in carrying it out and subsequently finding it to be unconstitutional. In commenting on the value of a judicial declaration in such a situation, Professor Borchard wrote as follows: "To compel an officer * * * thus to stake his security and livelihood in every case on the correctness of his conjecture on the constitutionality of the statute is a burden which no civilized system should impose upon any officer. * * * Needless to say, the declaratory judgment, initiated either by the officer or by the citizen affected, supplies the way out of the dilemma. It avoids all the attendant risks of mistaken and unconstitutional action, without delaying seriously the performance of public functions." *Borchard, Declaratory Judgments,* 2d Ed., 771.

The State Comptroller and State Treasurer were not necessary parties to the proceedings. They do not take any part in determining the amounts of the franchise taxes on the deposits of the savings banks, or in apportioning such taxes between the State and the City of Baltimore or the County in which the bank is situated.

The State Tax Commission calculates the amounts of the franchise taxes and then apportions them. It is then the duty of the Commission to certify to the Comptroller the amounts due to the State, after which the money is received by the Treasurer. Therefore, the functions of these officials were not affected by the challenged Act. Code 1951, art. 81, sec. 126.

Nor was the Attorney General of Maryland a necessary party to the proceedings. Section 11 of the Declaratory Judgments Act provides: "In any proceeding which involves the validity of a municipal ordinance, or franchise, such municipality shall be made a party, and shall be entitled to be heard, and if the statute, ordinance, or franchise is alleged to be unconstitutional, the Attorney-General of the State shall also be served with a copy of the proceeding and be entitled to be heard." Hence, the Attorney General was entitled to have notice of the proceedings, and to have the opportunity to decide whether to intervene on behalf of the State or any State agency affected.

Passing to the merits of the cases, we consider the first contention that the Act is ambiguous. The Act provides that the tax rate on the deposits of the savings banks shall be as follows: 22 cents per $100 on the total amounts of deposits for the year 1954; 19 cents per $100 for the year 1955; 16 cents per $100 for the year 1956; 13 cents per $100 for the year 1957; 10 cents per $100 annually thereafter. Immediately following this list of rates are the words: "of one per centum on the total amount of deposits held by such savings bank, institution or corporation." Complainants argue that one possible interpretation of the Act is that, in addition to the tax at the rate of 22 cents for 1954, 19 cents for 1955, 16 cents for 1956, 13 cents for 1957, and 10 cents thereafter, there is a further annual tax of one per cent on the amount of deposits. Under that interpretation, the Act would have the effect of increasing, rather than reducing, the franchise tax on savings banks.

In so doing, it would frustrate the intention of the Legislature as shown by the history of the Act.

It appears that the savings banks had been protesting for some years that the franchise tax imposed upon them was grossly discriminatory. They presented figures to show that the rate of the Maryland tax was more than five times the national average. They further showed that, as a result of an increase in deposits and a decrease in the return on investments, the effective rate of the tax in relation to the net rate of interest earnings had risen 93 per cent between 1934 and 1949.

Accordingly a bill was introduced in the State Senate at the 1949 session to reduce the tax. At that session other bills had been introduced to reduce various taxes and licenses on the ground that they were inequitable and imposed undue hardships; and the Legislature, announcing that it was unable to give sufficient consideration to all of those bills at that session, passed three Joint Resolutions requesting the Governor to appoint Commissions to study the laws of Maryland imposing taxes and licenses. Governor Lane, complying with those Resolutions, appointed the Maryland Tax Survey Commission, with Richard W. Case, of the Baltimore bar, as chairman. That Commission, in its report to the Governor and Legislature, took cognizance of the appeals of the savings banks for a reduction of the franchise tax from one-fourth of one per cent on the total amount of deposits to one-tenth of one per cent. The Commission reported that, although such a reduction would result in an overall loss in revenue of approximately $600,000 annually in terms of 1949 deposits, nevertheless the tax was so high in comparison with the share tax levied on commercial banks that the reduction was not only warranted but necessary for the alleviation of an undue hardship. *Report, Md. Tax Survey Commission of 1949,* March, 1951, 196-201.

On March 11, 1953, a bill was introduced in the House of Delegates to reduce the franchise tax from one-fourth of one per cent to one-tenth of one per cent. The bill

was referred to the Ways and Means Committee, and that Committee reported the bill favorably with amendments on March 26, several days before final adjournment of the Legislature. The Committee favored a reduction of the tax if made gradually over a period of five years. It is evident that the draftsman of the amendments for the Committee saw that it would be much simpler to state the five tax rates in number of cents per $100 on the total amount of deposits than in fractions of one per cent. It is evident that in striking out the word "one-tenth," and inserting the five new rates, the draftsman inadvertently failed to strike out the following words: "of one per centum on the total amount of deposits held by such savings bank, institution or corporation." This interpretation is irresistible, especially since the word "annually" was stricken out of the phrase "shall pay, annually, a franchise tax, to the amount of." The bill, as amended by the Committee, was passed by the House and the Senate and was approved by the Governor.

It has been repeatedly stated as a general rule that a court may not surmise a legislative intention contrary to the plain language of a statute, nor insert or omit words to make the statute express an intention not evidenced in its original form. *Bouse v. Hull*, 168 Md. 1, 176 A. 645; *State Tax Commission v. Potomac Electric Power Co.*, 182 Md. 111, 32 A. 2d 382; *Smith v. Higinbotham*, 187 Md. 115, 48 A. 2d 754; *Welsh v. Kuntz*, 196 Md. 86, 75 A. 2d 343. However, where words are found in a statute which appear to have been inserted through inadvertence or mistake, and which are incapable of any sensible meaning or are repugnant to the rest of the statute and tend to nullify it, and the statute is complete and sensible without them, they may be rejected as surplusage. *Lancaster County v. City of Lancaster*, 160 Pa. 411, 28 A. 854; *Hutchings v. Commercial Bank*, 91 Va. 68, 20 S. E. 950; *Bird v. Board of Com'rs of Kenton County*, 95 Ky. 195, 24 S. W. 118; *State v. Bates*, 96 Minn. 110, 104 N. W. 709; *Paxton & Hershey*

*Irrigating Canal & Land Co. v. Farmers' and Merchants' Irrigation and Land Co.,* 45 Neb. 884, 64 N. W. 343, 29 L. R. A. 853; *United States v. Jackson,* 9 Cir., 143 F. 783, 787.

This rule was adopted by the United States Supreme Court in *Huidekoper's Lessee v. Douglass,* 3 Cranch 1, 66, 2 L. Ed. 347, where Chief Justice Marshall, holding that several words in an Act of the Legislature of Pennsylvania should be disregarded, spoke as follows: "The law requiring two repugnant and incompatible things, is incapable of receiving a literal construction, and must sustain some change of language to be rendered intelligible. This change, however, ought to be as small as possible, and with a view to the sense of the legislature, as manifested by themselves. * * * The effect of this correction of language will be to destroy the repugnancy which exists in the act as it stands, and to reconcile this part of the sentence to that which immediately follows * * *."

In *Leavitt v. Lovering,* 64 N. H. 607, 15 A. 414, 1 L. R. A. 58, the Supreme Court of New Hampshire considered a statute which provided that when an assignment shall be made by a debtor for the benefit of creditors, "all attachments shall be void except such as have been made three months previous to such assignment, and all payments, pledges, mortgages, conveyances, sales, and transfers made within three months next before said assignment, and after the passage of this act, and before the 1st of September next, * * * shall be void * * *." It was entirely clear that the words "and before the 1st of September next" were included in the statute inadvertently. The Court thus held that no effect could be given to those words, and it was necessary to reject them as meaningless.

In *Ilg Electric Ventilating Co. v. Conner,* 172 Minn. 424, 215 N. W. 675, the Supreme Court of Minnesota considered a statute providing that no action shall be maintained on a public contractor's bond unless "the plaintiff shall serve upon the principal and his sureties

a notice specifying the nature and amount of his claim and the date of furnishing the last item thereof." It was evident that the words "and the date of furnishing the last item thereof," which were included in the pre-existing statute, had been retained in the new statute inadvertently. The Court therefore held that, since the words were meaningless, they should be eliminated.

Of course, it must be certain that the Legislature could not possibly have intended the words to be in the statute, and that the rejection of them serve merely as a correction of careless language and actually gives the true intention of the Legislature. The cardinal rule of statutory construction is that the court should ascertain from the entire statute the intention to be accomplished by the enactment. When that intention is clear it should be carried out, even though it may be necessary to strike out or insert certain words.

The intention of the Legislature in the enactment of Chapter 783 of the Laws of 1953 is perfectly clear. It is evident that after the word "one-tenth" was stricken out and the new formula prescribing the rate in number of cents per $100 was substituted, the lawmakers during the turmoil before the close of the session either did not detect the words, which the draftsman of the amendments had failed to eliminate, or else did not consider that it was prudent or necessary to jeopardize the measure by submitting another amendment to the bill to strike out the incongruous words. Our conclusion, therefore, is that these words do not invalidate the Act, but may be disregarded as surplusage.

We come now to the second contention that the title and the body of the Act are inconsistent. The Act is entitled: "An Act to repeal and re-enact, with amendments, Section 126 of Article 81 of the Annotated Code of Maryland (1951 Edition), title 'Revenue and Taxes', sub-title 'Special Taxes', sub-heading 'Franchise Tax on Deposits of Savings Banks', reducing the amount of said tax and changing the apportionment thereof." It is not disputed that the title calls for a change in the apportion-

ment of the tax between the State and the City of Baltimore or the County in which the bank is situated, while the body does not make any change in this apportionment.

The ultimate question for determination is whether the Act violates Article III, Section 29, of the Constitution of Maryland, which directs that "every law enacted by the General Assembly shall embrace but one subject, and that shall be described in its title." This provision made its first appearance in the Constitution of 1851, Article III, Section 17. A few years afterwards the Court of Appeals in *Davis v. State*, 7 Md. 151, 160, speaking through Judge Mason, gave approval to the new constitutional requirement in the following language:

"A practice had crept into our system of legislation, of engrafting, upon subjects of great public benefit and importance, for local or selfish purposes, foreign and often pernicious matters, and rather than endanger the main subject, or for the purpose of securing new strength for it, members were often induced to sanction and actually vote for such provisions, which if they were offered as independent subjects, would never have received their support. In this way the people of our State, have been frequently inflicted with evil and injurious legislation. Besides, foreign matters has often been stealthily incorporated into a law, during the haste and confusion always incident upon the close of the sessions of all legislative bodies, and it has not unfrequently happened, that in this way the statute books have shown the existence of enactments, that few of the members of the legislature knew anything of before. To remedy such and similar evils, was this provision inserted into the constitution, and we think wisely inserted."

As the bills introduced in the Legislature are usually read by their titles only, and only the titles are printed

in the Senate and House Journals, the value of this constitutional requirement is recognized in accomplishing three objects: (1) to prevent hodgepodge or logrolling legislation; (2) to prevent surprise or fraud upon members of the Legislature by giving notice of provisions in bills which might otherwise be overlooked and carelessly and unintentionally adopted; and (3) to apprise the citizens of the State of the subjects of legislation which are being considered, so that anyone may have an opportunity to be heard thereon, by petition or otherwise. *Fout v. Frederick County Com'rs,* 105 Md. 545, 563, 66 A. 487; *Com'rs of Somerset County v. Pocomoke Bridge Co.,* 109 Md. 1, 71 A. 462; *Neuenschwander v. Washington Suburban Sanitary Commission,* 187 Md. 67, 78, 48 A. 2d 593.

The test for determining whether the title of an act is so faulty that it violates Article III, Section 29, of the State Constitution, is whether there is a likelihood that the title may have led to a misconception of the enactment. *Board of Education of Baltimore County v. Wheat,* 174 Md. 314, 318, 199 A. 628. A typical example is *Culp v. Commissioners of Chestertown,* 154 Md. 620, 141 A. 410, where the Court considered an act which provided for the issuance of bonds and an annual levy of taxes for the purpose of making certain municipal improvements, but the title of which failed to mention a provision in the act that a part of the cost of the improvements would be charged to adjoining property owners. The Court held the statute void.

Here, however, it cannot be said that the inconsistency between the title and the body of the Act frustrated the objects of the constitutional provision. The likelihood of deception is not so great as to render the title fatally defective. There was, of course, no objection to the form of the bill as it was introduced, because it provided both in its title and body for a change in the apportionment of the tax. The Revenue and Tax Law at that time apportioned one-fourth of the tax to the State and three-fourths to the political subdivision; the bill

as it was introduced provided that the apportionment should be one-tenth to the State and nine-tenths to the political subdivision. The Ways and Means Committee amended the bill to let the apportionment remain exactly as the law stood. It is obvious that the draftsman of the amendments inadevertently failed to eliminate from the title the words "and changing the apportionment thereof." We find no substantial objection to the bill even after it was amended. First, there was no incongruous matter in it to condemn it as hodgepodge or log-rolling legislation. Second, there is no likelihood that the amendments perpetrated any deception upon the members of the Legislature. Third, there was no lack of notice to the people of the State. If the body of the bill had provided for a change in apportionment and the title had failed to mention it, then there might have been some justification for complaint that there was lack of notice of the contents of the bill. In *Painter v. Mattfeldt,* 119 Md. 466, 474, 87 A. 413, this Court held that the title of the act must not be misleading by apparently limiting the enactment to a much narrower scope than the body of the act is made to compass. But the title of the Act here in question gave even more notice than was actually necessary, and in this particular case the inconsistency was harmless.

We think it appropriate to mention here that it has always been accepted in Maryland that the title of an act repealing and re-enacting a previous act is adequate if it describes the previous act only by reference to the article and section of the Code in which it is incorporated. *Mayor and City Council of Baltimore v. Fuget,* 164 Md. 335, 165 A. 618, 88 A. L. R. 1058; *Bevard v. Baughman,* 167 Md. 55, 71, 173 A. 40; *Campbell v. Campbell,* 174 Md. 229, 198 A. 414, 116 A. L. R. 939. Moreover, this Court has held that if an act contains in its title a sufficient description of the subject of the act, its validity is not affected by the fact that it also proposes in its title to re-enact another act, although in fact it does not re-enact it. *Mount Vernon Woodberry Cotton Duck Co.*

*v. Frankfort Marine Accident & Plate Glass Insurance Co.,* 111 Md. 561, 75 A. 105.

As the title of the Act now before us actually gave a superabundance of notice, it is our conclusion that the words "and changing the apportionment thereof" should be considered as harmless surplusage. We recall the words of Chief Judge Alvey in *State v. Norris,* 70 Md. 91, 96, 16 A. 445: "Many Acts are passed, and often of great importance, the titles of which are exceedingly deficient in definite and clear description of the subject-matter of the Act. But this court has ever been reluctant to defeat the will of the Legislature by declaring such legislation void, if by any construction it could possibly be maintained."

> *Decree in No. 84 affirmed, with costs.*

> *Decree in No. 85 affirmed, with costs.*