846 A.2d 996

**Jodi STERN, et al.**

v.

**BOARD OF REGENTS, UNIVERSITY SYSTEM OF MARYLAND, et al.**

**No. 85, Sept. Term, 2003.**

Court of Appeals of Maryland.

April 12, 2004.

Reconsideration Denied May 6, 2004.

692

Andrew D. Freeman (Deborah Thompson Eisenberg, Brown, Goldstein & Levy, LLP, on brief), Baltimore, for appellants/cross-appellees.

John K. Anderson, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Dawna M. Cobb, Asst. Atty. Gen., on brief), for appellees/cross-appellants.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

**694**

CATHELL, J.

This case arises out of a mid-year tuition increase authorized by the Board of Regents of the University System of Maryland. On January 23, 2003, the Board of Regents, responding to the Legislature's mid-fiscal year budget cuts, authorized its constituent institutions to increase their respective tuition for the 2003 Spring semester by up to five percent. Of the eleven institutions authorized to raise tuition, nine chose to do so.[1] Appellants, representative students who were enrolled at the nine institutions electing to raise tuition for the Spring 2003 semester, filed suit in the Circuit Court for Baltimore City against the Board of Regents, Chancellor William E. Kirwan and David Ramsey, President of the University of Maryland, Baltimore, appellees, challenging the Board's authority to impose the mid-year tuition increase.[2]

Appellants alleged three counts in their February 14, 2003 complaint, including breach of contract, equitable estoppel and violation of the Consumer Protection Act for deceptive trade practices. Along with their complaint, appellants included a Motion for a Temporary Restraining Order and Preliminary Injunction requesting that the Circuit Court enjoin collection

---

1. Md.Code (1978, 2001 Repl.Vol.), § 12–101(b)(4) of the Education Article enumerates the eleven public higher education institutions under the jurisdiction of the Board of Regents, including:
 "(i) University of Maryland, Baltimore;
 "(ii) University of Maryland Baltimore County;
 "(iii) University of Maryland, College Park;
 "(iv) University of Maryland Eastern Shore;
 "(v) University of Maryland University College;
 "(vi) Bowie State University;
 "(vii) Coppin State College;
 "(viii) Frostburg State University;
 "(ix) Salisbury University;
 "(x) Towson University; and
 "(xi) University of Baltimore."
 The University of Maryland University College and Coppin State College are the two institutions that did not raise tuition, mid-year, for the Spring 2003 semester. Students from the other nine institutions are involved in this lawsuit.

2. Hereinafter we shall refer to appellees collectively as the "Board."

of the tuition increase. Appellants then moved to certify their suit as a class action.

The Circuit Court, on March 4, 2003, denied appellants' motion for a preliminary injunction and scheduled a hearing on the merits. On March 19, 2003, the parties filed a stipulation that the ruling on the motion to certify the suit as a class action would be stayed until the Circuit Court's ruling on the merits of the preliminary injunction. The parties also stipulated that appellants could conduct discovery and offer evidence as if the class had been certified.

On April 15, 2003, the Circuit Court heard arguments on the cross-motions for summary judgment and ruled that sovereign immunity barred appellants' contract claims and that appellants failed to establish the existence of a written contract in respect to tuition signed by an authorized employee or official of the University. In granting the Board's motion for summary judgment, the Circuit Court stated:

"Even if this Court were to find that a contract existed between the [appellants] and the [Board], such a contract would clearly have to be an implied contract. The Court [of Special Appeals] in *Mass Transit Administration v. Granite Construction Company* [57 Md.App. 766, 471 A.2d 1121 (1984) ] has made it clear that no matter how well founded a claim against the State or its agencies might be, if it's based on an implied contract, it's barred by the Doctrine of Sovereign Immunity due to the absence of a written contract." [Alterations added.]

The Circuit Court additionally found that the other two counts in appellants' complaint, the equitable estoppel and Consumer Protection Act (CPA) counts, could not be asserted against a State agency. Appellants have not presented the CPA and equitable estoppel issues in this appeal.

On the following day, appellants filed a Motion to Alter or Amend. The Circuit Court held a hearing on this motion on April 22, 2003 and denied the motion; a written opinion was issued on April 23, 2003. In that opinion, the Circuit Court stated:

"this Court finds as a matter of law that there is no express contract between [appellants] and any of the [appellees]. Despite [appellants'] contention that various documents (including the fees sheets, registration packets, tuition bills and acceptance of tuition payments) created an express contract between the parties, that does not—as a matter of law—constitute an express contract. It is noteworthy but not dispositive, that various University catalogs disclaim the existence of a contract.

. . .

"The Court believes that is what best describes, legally, the relationship between the parties here, that is, a quasi-contract between the students and their respective universities. . . .

"Other jurisdictions have held that under 'quasi-contract' analysis, a university may make unilateral changes if such changes are within the reasonable expectations of reasonable students in light of all of the circumstances and in light of all the materials that establish the framework of the relationship."

The Circuit Court went on to find that the Board's actions in this case were reasonable and thus denied appellants' motion.

Appellants then filed a notice of appeal to the Court of Special Appeals. On December 11, 2003, on our own initiative, this Court granted a writ of certiorari to undertake review of these issues prior to the intermediate appellate court taking action on the case. *Stern v. Board of Regents,* 378 Md. 613, 837 A.2d 925 (2003). In their brief, appellants present two questions for our review:

"1. Did the University System of Maryland's mid-year tuition increase breach the contracts it had made with students regarding the price owed for the Spring 2003 semester?

"2. If so, do the appellees enjoy sovereign immunity

from enforcement of the tuition contract?"[3]

The Board filed a cross-appeal challenging the Circuit Court's ruling that appellants' claim for declaratory and injunctive relief was not barred by sovereign immunity. The Board presents three questions in its cross-appeal:

"1. Did the trial court correctly conclude that there was no express written contract executed by an authorized University official and that sovereign immunity barred the students' claim for damages?

"2. Did the trial court correctly conclude that the students' claim for declaratory and injunctive relief was not barred by sovereign immunity and could be based upon a quasi-contract theory?

"3. Did the trial [court] correctly conclude that the students were not entitled to any declaratory and injunctive relief under a quasi-contract theory because the University acted reasonably in raising tuition?" [Alterations added.]

We answer in the affirmative to appellants' second question and hold that the Board has sovereign immunity from suit on the tuition increase. As we hold that the Board has sovereign immunity, we do not directly address the merits of appellants' first question. In reference to the Board's cross-appeal, we hold that the trial court erred in not concluding that, under the circumstances of this case, appellants' claims for declaratory and injunctive relief were barred by sovereign immunity.

## I. Facts

During a typical year, the Board sets tuition rates approximately one year in advance. For the academic year in question in the case *sub judice*, the 2002–2003 school year, the Board provisionally approved tuition rates based upon its

---

**3.** The questions posed by appellants do not directly address whether they are entitled to refunds. In the suits below, however, they pressed a claim for damages relating to the tuition increases. Additionally, the appellants in their briefs proffer our recent case of *Frankel v. Board of Regents of University of Maryland System*, 361 Md. 298, 761 A.2d 324 (2000), as support for their claims of damages. *Frankel* was a refund case. Accordingly, we will also address the matter of refunds in relation to sovereign immunity in the circumstances of this case.

budget in August of 2001. These rates were increased slightly in May of 2002 following the General Assembly's enacting of the State Budget and in light of the University's actual budget appropriation.

During the Fall 2002 semester, appellants received registration materials advertising courses for the Spring 2003 semester, with pricing, from their respective institutions. Appellants relied on these registration materials in their decisions to enroll in classes for the Spring 2003 semester. In November and December of 2002,[4] after following the proper registration procedures, appellants received bills from their respective institutions confirming the specific charges due for the spring courses for which appellants' had registered. These bills had due dates ranging from December 17, 2002 until January 31, 2003[5] and a majority of students promptly paid their bills and received $0 balance notices prior to the due dates.

The State budget crises escalated in the fall of 2002, thus the possibility of budget cuts for several State agencies was apparent. In October, and November of 2002, the presidents of the various University of Maryland System institutions and the Board met to discuss the possibility of budget cuts to the University System and approaches on how to deal with possible cuts. A mid-year tuition increase, along with expanded hiring freezes, staff furloughs and cancellation of certain operating expenses, were discussed as a method of absorbing the cost of the likely budget cuts.

The Board learned of $30.4 million in immediate budget cuts for fiscal year 2003 on November 20, 2002. After discussing the cuts with the presidents of each university institution, it was determined not to raise tuition at that time. Approxi-

---

4. At the University of Maryland, Baltimore County, due to printing errors, some bills were mailed on January 3, 2003 and due January 22, 2003, despite being dated on December 17, 2002 with a printed January 6, 2003 due date.

5. If the bill was not paid by the due date, each institution advised its students of the imposition of late fees, loss of university privileges and potential referrals to collection agencies and litigation.

mately one month later, on December 23, 2002, the Board learned that another $36.6 million in budget cuts for the fiscal year 2003 was probable. In reaction to discovering that information, the Board called a special meeting on December 23, 2003 to consider mid-year tuition increases for the Spring semester of 2003. A letter to students was soon prepared to inform the students of the imminent tuition increase. That letter was mailed to the University System institutions on January 8, 2003 and was promptly sent out by each institution to each respective student.[6]

The text of that letter to the students was signed by the Chancellor and the Board of Regents' Chairman. It discussed the various methods by which the University System had already attempted to absorb previous budget cuts, including hiring freezes, eliminating positions and reducing operating expenses. Relevant to the case *sub judice*, the letter also stated that if further budget cuts occurred the University System would find it necessary to approve mid-year tuition increases for the Spring 2003 semester that would not exceed 5%.[7]

On January 17, 2003, Governor Ehrlich's budget for fiscal year 2004 was released to the public and it confirmed the additional $36.6 million budget cut. In response to the official word of the University System's loss of budgetary funds, the Board met on January 23, 2003 and authorized tuition increases of up to 5% for the Spring 2003 semester at nine of its institutions.[8] The tuition increase recovered approximately $12.9 million of the total $60.7 million budget cuts.

---

**6.** The Board contends that the "[t]he need to consult with various people about the text combined with the fact that the [University System of Maryland] was officially closed from December 24 through January 2, 2003, made it impossible to mail the letter before January 8, 2003" (alterations added).

**7.** Appellants contend that by the time many of the students received this January 8, 2003 letter, they had already registered for their courses, received a bill, paid it and had $0 account due balances.

**8.** As previously mentioned, Coppin State College and University of Maryland University College chose not to raise tuition.

Appellants challenged the Board's authority for its January 23rd approval of the mid-year tuition increase, alleging that it violated appellants' express contracts with their respective institutions.

## II. Discussion

The primary question in the case *sub judice* is whether the Board has sovereign immunity barring appellants' claims that the Board breached a tuition contract with appellants. We ultimately hold that the Board is entitled to sovereign immunity under these circumstances, thus appellants' claims are barred.

The doctrine of sovereign immunity has long been recognized as applicable in actions against the State of Maryland and its official representatives. *Baltimore County, Maryland v. Rtkl Associates, Inc.*, 380 Md. 670, 846 A.2d 433 (2004); *ARA Health Services, Inc. v. Dep't of Public Safety and Correctional Services*, 344 Md. 85, 91, 685 A.2d 435, 438 (1996); *see also Board of Trustees of Howard Community College v. John K. Ruff, Inc.*, 278 Md. 580, 584, 366 A.2d 360, 362 (1976). We have said that sovereign immunity is rooted in the common law and "is firmly embedded in the law of Maryland." *Katz v. Washington Sub. Sanitary Comm'n*, 284 Md. 503, 507, 397 A.2d 1027, 1030 (1979). The doctrine was "[d]erived from the ancient view of the sovereign as infallible" and its effect "precludes suit against governmental entities absent the State's consent." *ARA Health*, 344 Md. at 91–92, 685 A.2d at 438 (alteration added). *See also Dep't of Natural Resources v. Welsh*, 308 Md. 54, 58–59, 521 A.2d 313, 315 (1986). We have emphasized that "the dilution of the doctrine" of sovereign immunity should not be accomplished by the judiciary, and that any direct or implied diminution of the doctrine falls within the authority of the General Assembly. *ARA Health*, 344 Md. at 92, 685 A.2d at 438; *see also Welsh*, 308 Md. at 59, 521 A.2d at 315. The test that this Court has utilized in assessing whether the doctrine applies in a particular case is "(1) whether the entity asserting immunity qualifies for its protection; and, if so, (2) whether the legislature has

waived immunity, either directly or by necessary implication, in a manner that would render the defense of immunity unavailable." *ARA Health,* 344 Md. at 92, 685 A.2d at 438. *See also Ruff,* 278 Md. at 586, 366 A.2d at 363.

 As we have stated, when a governmental agency or actor can, and does, avail itself of the doctrine of sovereign immunity, no contract or tort suit can be maintained thereafter against it unless the General Assembly has specifically waived the doctrine. The doctrine serves many purposes, including protecting "the State 'from burdensome interference with its governmental functions and [preserving] its control over State agencies and funds.'" *Maryland State Highway Admin. v. Kim,* 353 Md. 313, 333, 726 A.2d 238, 248 (1999) (quoting *Katz,* 284 Md. at 507, 397 A.2d at 1030) (alteration added). Even where a statute specifically waives the doctrine, a suit may only be maintained where there are "funds available for the satisfaction of the judgment" or the agency has been given the power "for the raising of funds necessary to satisfy recovery against it." *University of Maryland v. Maas,* 173 Md. 554, 559, 197 A. 123, 126 (1938). In that regard, where a statute specifically authorizes suit and a waiver of immunity, we stated in *Ruff,* a case involving the Board of Trustees of Howard Community College, that:

> "We conclude that when the General Assembly expressly authorizes suits to be brought against one of the State's agencies, it is the giving of a positive consent and has the effect of waiving sovereign immunity as to that agency within its scope of duties and obligations. It does not necessarily follow, however, that a money judgment may therefore be obtained, even with respect to matters within the scope of the duties of the agency.... [A]n action for a money judgment may not be maintained unless funds had been appropriated for that purpose or the agency can provide funds by taxation."

*Ruff,* 278 Md. at 590, 366 A.2d at 366. It is clear that without a specific legislative waiver and appropriation, or taxing power, sovereign immunity is applicable in respect to the State.

There is no doubt, and the parties in this case do not dispute, that the Board is considered to be an arm of the State Government for the purposes of asserting the defense of sovereign immunity. *See* Md.Code (1978, 2001 Repl.Vol.), § 12–102 of the Education Article;[9] *see also Frankel v. Board of Regents of University of Maryland System*, 361 Md. 298, 301, 761 A.2d 324, 325 (2000) (recognizing that the University of Maryland, which is a part of the University System of Maryland, is an independent unit of the Maryland State government); *Maas*, 173 Md. at 557, 197 A. at 124 (recognizing that the University of Maryland was a State actor for the purposes of sovereign immunity); *Pearson v. Murray*, 169 Md. 478, 482, 182 A. 590 (1936) (holding that the University of Maryland Law School was a State agency). As the Board is clearly considered a State actor and may raise the defense of sovereign immunity, the next factor to consider is whether the General Assembly has either directly or implicitly waived the Board's immunity in factual circumstances such as in the case *sub judice*.

Appellants argue that the Board cannot avail itself of the defense of sovereign immunity for four reasons. First, appellants contend that this Court's decision on the waiver issue in *Frankel, supra*, 361 Md. 298, 761 A.2d 324, stands for the proposition that sovereign immunity has been waived in all cases involving tuition disputes. Second, appellants argue that a contract existed between the parties, which fell within the requirements of Md.Code (1984, 1999 Repl. Vol), § 12–

---

**9.** Section 12–102 states, in relevant part:

" **§ 12–102. Board of Regents—Government of University; members.**

(a) *University as body corporate and politic.*—(1) There is a body corporate and politic known as the University System of Maryland.

(2) The University is an instrumentality of the State and a public corporation.

(3) The University is an independent unit of State government.

(4) The exercise by the University of the powers conferred by this subtitle is the performance of an essential public function.

(b) *Government of University.*—The government of the University System of Maryland is vested in the Board of Regents of the University System of Maryland."

201(a) of the State Government Article and its waiver of sovereign immunity in actions involving a written contract executed by a State official acting within his or her authority. Appellants' third argument is that the Board cannot avail itself of the defense of sovereign immunity because that defense does not apply to any request for declaratory or injunctive relief. Finally, appellants contend that the Board breached a contract between the parties by unreasonably raising tuition for the Spring 2003 semester after the students had paid the bill in full and that the Board cannot assert sovereign immunity as a defense.

The Board counters by arguing that sovereign immunity is not waived in the case *sub judice.* They contend that sovereign immunity is not waived where, as in this case, there is no express written contract executed, *i.e.,* signed, by a State official acting within the scope of his or her authority. They add that the burden was on appellants to prove whether such a contract existed and that the trial court correctly found that appellants failed to meet that burden. The Board additionally argues that even if an implied contract existed, such a contract does not defeat the defense of sovereign immunity as the Board urges this Court that the facts in the case *sub judice* are distinguishable from those of *Frankel.* They additionally contend that sovereign immunity bars declaratory and injunctive relief in contract actions and, in the alternative, that appellants' claim was not a proper claim for declaratory and injunctive relief. Finally, the Board asserts that, even if sovereign immunity is waived as to requests for declaratory and injunctive relief, the Board acted reasonably in raising tuition under the circumstances.

For the reasons stated *infra,* we agree with the Board and hold that sovereign immunity was not waived under the circumstances in this case and appellants are thus not entitled to any relief.

## A. The *Frankel* case

As mentioned previously, appellants rely heavily on our recent case of *Frankel, supra.* Appellants claim that the

language in *Frankel* should be applied to the case *sub judice,* as it waives sovereign immunity in that case for four independent reasons:

"(1) the general waiver of governmental immunity in contract actions, Md.Code Ann., St. Gov't § 12–201; (2) the right to a refund against the State by a claimant who pays a greater amount of a fee or charge than is properly and legally payable, Md.Code Ann., Tax–Gen. § 13–901(a); (3) the policy passed by the Board entitling a student to a refund upon re-classification from out-of-state to in-state status, which gives rise to a common law contract action; or (4) the 'sue and be sued' provision in Section 12–104(b)(3) of the Education Article, which waives immunity in actions within the scope of the Board of Regents' duties and obligations, including tuition and contract matters."

We do not agree.

In *Frankel,* we held that a University of Maryland, College Park student was entitled to have a determination of his residency status for tuition purposes based on his domicile and not the policies regarding primary sources of income. In *Frankel,* the Board of Regents argued that the student's retrospective claims were barred by sovereign immunity. In response to the Board's argument, we discussed several ways in which sovereign immunity may have been waived in that case. First, we stated:

"[T]here is no merit in the suggestion that Jeremy's claim is barred by governmental immunity. Even if the only basis for the claim were the general waiver of governmental immunity in contract actions set forth in Code (1984, 1999 Repl.Vol.), §§ 12–201 through 12–204 of the State Government Article, Jeremy's claim would not be barred by the one year period of limitations in § 12–202. Jeremy filed this action within a year from the final administrative decision denying his request for in-state status and his claim for a refund. As previously discussed, he did not abandon his claim for a refund."

*Frankel,* 361 Md. at 308, 761 A.2d at 329. Neither in this, nor any other section of *Frankel,* did we address the merits of the question of whether Md.Code §§ 12–201 through 12–204 of the State Government Article waived the Board's immunity in that case, *i.e.,* we never addressed whether there was a written contract executed by a State official acting within his or her scope of authority between Mr. Frankel and the Board of Regents. The case provides no discussion in that regard. We merely stated that § 12–202's statute of limitations [10] would not defeat the student's claim and we went on to address the merits of three other ways in which the Board had, in that case, waived its immunity. *Frankel,* therefore, is not dispositive on this issue.

The next alternative waiver of immunity discussed in *Frankel* involved a theory that the Tax General Article authorized a refund for tuition overcharges. We stated:

> "There are, moreover, grounds for Jeremy's claim other than §§ 12–201 through 12–204 of the State Government Article. *It may be* that Code (1988, 1997 Repl.Vol., 1999 Supp.), § 13–901(a) of the Tax General Article, is applicable when a state college or university charges a student more for tuition than is legally payable. That section broadly authorizes a refund claim against the State by a claimant who '(1) erroneously pays to the State a greater amount of ... fee, [or] charge ... than is properly and legally payable.' Under § 13–1104(a), a claimant has three years from the date of payment to file 'a claim for refund under this

---

**10.** In footnote 1 in *RTKL Associates, supra,* 380 Md. at 677 n. 1, 846 A.2d at 437 n. 1, we stated:

> "The issue of whether Art. 25A, § 1A(c) and its counterparts applicable to actions against the State and other political subdivisions of the State are true statutes of limitations or conditions on the right to sue has not been raised in this case and is not relevant to this case. That issue is before us in another case. We refer to those provisions as statutes of limitations for convenience and because the parties have done so."

We likewise refer in this case to the time period in § 12–202 as a "statute of limitations" solely for purposes of convenience.

article . . . ,' and Jeremy clearly filed his claim and brought this action within that time."

*Frankel,* 361 Md. at 308, 761 A.2d at 329 (emphasis added). The language *"[i]t may be* that Code (1988, 1997 Repl.Vol., 1999 Supp.), § 13–901(a) of the Tax General Article, is applicable" makes clear that we did not specifically hold that Md. Code (1988, 1997 Repl.Vol., 1999 Supp.), § 13–901(a) of the Tax General Article applied in *Frankel.* That language was *dicta.*[11]

Next, the *Frankel* case sets out what is perhaps the crux of its holding-its discussion of the Board's specific adopted policy and regulations entitling students to a refund of tuition where a student is reclassified from an out-of-state to in-state status. In that regard, we said:

"If the statutory refund remedy in §§ 13–901(a)(1) and 13–1104(a) of the Tax General Article is inapplicable to this case, the result would be no different. The General Assembly delegated to the Board very broad authority over tuition and fees (§ 12–109(e)(7) of the Education Article), and the Board adopted a Policy and regulations entitling a student to a credit or refund of tuition upon re-classification from out-of-state status to in-state status. It has long been settled in Maryland that when one pays to a state government agency or a local government more in taxes, fees, or charges than the government is entitled to, *and when the law specifically authorizes 'a refund, although no particular statutory remedy is provided,'* a common law contract 'action . . . is available.' *Apostol v. Anne Arundel County,* 288 Md. 667, 672, 421 A.2d 582, 585 (1980); *See, e.g., White v. Prince George's Co.,* 282 Md. 641, 653–654 n. 7, 387 A.2d 260, 267 n. 7 (1978) (where the law 'provided that the [claimant] was entitled to a refund but did not contain a special statutory remedy, . . . an action in assumpsit could be maintained'); *Baltimore v. Household Finance Corp.,*

---

11. The issue in the present case is not what relief is available for a person who has been charged more "than is legally payable," but whether tuition payment increases are legal in the first instance.

168 Md. 13, 14, 176 A. 480, 481 (1935) (a law, providing that one who paid 'more money for taxes or other charges than was properly and legally chargeable' was entitled to a refund, 'changed the common law rule that taxes [or other charges] paid under a mistake of law could not be recovered,' and therefore the plaintiff could bring an action in assumpsit, subject to the statute which 'provides that suits in assumpsit shall be commenced within three years after the cause of action accrued'); *Baltimore v. Home Credit Co.,* 165 Md. 57, 65, 166 A. 604, 607–608 (1933) (same); *George's Creek Coal & Iron Co. v. County Com'rs of Allegany County,* 59 Md. 255, 260–261 (1883) (same)."

*Frankel,* 361 Md. at 308–09, 761 A.2d at 329–30 (emphasis added).

The operative facts in *Frankel,* which distinguish it from the case *sub judice,* included a specific authorization by the Legislature to the Board of Regents, allowing the Board to set forth a policy to provide a refund to students who received a residency reclassification for tuition purposes and the Board of Regents had established a refund policy. We noted in *Frankel* that by enacting § 12–109(e)(7) of the Education Article, the General Assembly authorized the presidents of the various institutions, subject to the Board of Regents' policies, to set tuition and fees. In that case, the President of the University of Maryland, College Park adopted a policy, pursuant to the Board of Regents' policy, that provided for the aforementioned refund. In *Frankel,* we merely held that a common law action to recover a tuition refund for reclassifications of residency status existed. Once the Board of Regents and President of the University adopted a refund policy in respect to residency reclassifications pursuant to a delegation of authority from the Legislature, it necessarily waived its sovereign immunity in suits to recover under that policy. Our holding on that issue in *Frankel* relied upon the well-settled law as stated in *Apostol v. Anne Arundel County,* 288 Md. 667, 672, 421 A.2d 582, 585 (1980), where we stated:

"It is firmly established in this State that once a taxpayer voluntarily pays a tax or other governmental charge, under

a mistake of law or under what he regards as an illegal imposition, no common law action lies for the recovery of the tax *absent a special statutory provision sanctioning a refund.* This is true even if payment is made under protest. Moreover, in these circumstances, no common law or declaratory judgment action lies to challenge the validity of a tax so paid. *Where there is a special statutory provision sanctioning a refund, although no particular statutory remedy is provided, an action in assumpsit is available.* However, where there is statutory authorization for a refund and a special statutory remedy set forth, that remedy is exclusive. These principles have recently been reviewed at length in *Baltimore County v. Xerox Corp.,* 286 Md. 220, 406 A.2d 917 (1979); *White v. Prince George's Co.,* 282 Md. 641, 650–654, 387 A.2d 260 (1978); and *Rapley v. Montgomery County,* 261 Md. 98, 274 A.2d 124 (1971).

"Furthermore, the rule that no action lies to challenge the validity of a tax paid under a mistake of law, except for any refund sanction specifically provided by the Legislature, has been applied consistently by this Court, regardless of the nature of the legal attack mounted or the type of mistake of law claimed." [Emphasis added.]

The Board has adopted no policy in reference to refunds caused by general tuition increases; rather it adopted the tuition increase at issue in the case at bar—not a refund policy. The emphasized language in the quote from *Apostol* clearly illustrates that the common law right to sue for a refund only exists where a refund is authorized, although no statutory procedure for the remedy is provided. *Apostol* does not even mention sovereign immunity or how its holding relates to that doctrine. The more logical interpretation of *Apostol* is that, where the General Assembly authorizes a refund (in *Frankel* that refund was authorized pursuant to a legislative delegation of authority), sovereign immunity may be waived and a right to sue the State in an attempt to avail oneself of the refund may exist. The cases do not support extending this holding to waive immunity where no refund policy is authorized or exists.

In the case *sub judice*, unlike *Frankel*, no tuition refund policy exists for mid-semester increases of tuition. Appellants do not fall into a class, such as *Frankel's* residency reclassification class, subject to a refund policy provided for by a legislative delegation of power to the Board and/or Presidents of the System institutions. As no refund policy was provided for situations like the case *sub judice*, no waiver of sovereign immunity pursuant to a legislative delegation of authority, such as the ones in *Frankel* and *Apostol*, existed.

Finally, appellants' contend that our discussion in *Frankel* regarding the "sue or be sued" provision in Md.Code (1978, 2001 Repl.Vol.), § 12–104(b)(3) of the Education Article (§ 12–104(b)(3)), indicates that the Board's sovereign immunity has been waived. We stated in *Frankel:*

> "Apart from the general waiver of governmental immunity for contract actions in §§ 12–201 through 12–204 of the State Government Article, and the law concerning refunds of overpayments to governmental agencies, the General Assembly has authorized the Board to '[s]ue and be sued....' Code (1978, 1999 Repl.Vol.), § 12–104(b)(3) of the Education Article. Although a 'sue and be sued' provision ordinarily does ' "not alone constitute a general waiver of [governmental] immunity," ' it does waive immunity in actions concerning matters within the scope of the governmental agency's ' "duties and obligations." ' *Jackson v. Housing Opportunities Comm'n*, 289 Md. 118, 124, 422 A.2d 376, 379 (1980), quoting *Board of Trustees of Howard Community College v. John K. Ruff, Inc.*, 278 Md. 580, 590, 366 A.2d 360, 366 (1976), and *Katz v. Washington Suburban Sanitary Comm'n*, 284 Md. 503, 512, 397 A.2d 1027, 1033 (1979). *See O & B, Inc. v. Maryland–Nat'l Capital Park & Planning Com'n*, 279 Md. 459, 466–468, 369 A.2d 553, 557–558 (1977); *Weddle v. School Commissioners*, 94 Md. 334, 51 A. 289 (1902). The Board has a duty to 'prescribe policies and procedures' for the University System, and, in order to carry out that power and 'accomplish the purposes of the University,' the Board was granted the authority to '[e]nter into contracts of any kind.' § 12–104(b)(5) and (j) of the

Education Article. As earlier mentioned, the Board is expressly granted the authority to set 'tuition and fees.' § 12–109(e)(7) of the Education Article. Although the Board's waiver of governmental immunity for actions filed in tort may be limited 'to the extent of any applicable liability insurance,' the waiver of immunity for other actions is not so limited. *See* § 12–104(b) and (i) of the Education Article. Under all of the circumstances, the statutory authorization to 'be sued' waives any governmental immunity in declaratory judgment and *contract actions to recover tuition overcharges* which the Board might otherwise have enjoyed."

*Frankel,* 361 Md. at 309–10, 761 A.2d at 330 (emphasis added). Appellants appear to interpret § 12–104(b)(3) as granting an absolute waiver of sovereign immunity "in actions concerning matters within the scope of the governmental agency's 'duties and obligations.'" *Id.* at 310, 761 A.2d at 330 (internal citations omitted). The plain reading of that language in *Frankel* limited its application in that case to "contract actions to recover tuition overcharges," because, as we had noted earlier, there was legislation enabling the Board to adopt a policy regarding residency reclassifications and an express policy adopted by the Board pursuant to that authority relating to residency reclassifications and refunds of tuition sums in those instances beyond those sums that were legally payable had the residency classifications been initially correct. This statement in *Frankel* is also restricted by the last element in the *Maas* and *Ruff* test of the waiver of sovereign immunity, which was not overruled by *Frankel.*

As previously mentioned, *Mass, supra,* and later *Ruff, supra,* set out the elements to be considered by a court in addressing the issue of whether sovereign immunity has been waived. The *Maas* test was succinctly set forth in *Ruff,* a case where the issue of sovereign immunity was not briefed by the parties, but where this Court stated:

"Legislative authority for a governmental agency to be sued is not free from restrictions, even though limitations are not expressly made by the Legislature. Such authority

does not impose unqualified liability even as to matters within the scope of the agency's duties and obligations. This Court has consistently held that suits may not be maintained unless money has been appropriated for the payment of such damages as may be awarded, or the agency itself is authorized to raise money for that purpose. We said in *University of Maryland v. Maas, supra,* 173 Md. at 558–559, 197 A. at 125:

'The decisions in this state go further than holding that without legislative sanction an arm of the state government ... may not be sued, and are to the effect that, even though there is a legislative authorization to sue, such suits may not be maintained unless funds are available or may be made available by the agency itself for the purpose of paying the claim for damages that may be established by the suit....

'So it is established that neither in contract nor tort can a suit be maintained against a government agency, first, where specific legislative authority has not been given, second, even though such authority is given, if there are no funds available for the satisfaction of the judgment, or no power reposed in the agency for the raising of funds necessary to satisfy a recovery against it.'

*See Bolick v. Bd. of Education of Charles Co., supra,* 256 Md. at 183, 260 A.2d at 32, and *Thomas L. Higdon, Inc. v. Board, supra,* applying it; *Weisner v. Bd. of Education, supra; Williams v. Fitzhugh, supra; Fisher & Carozza Co. v. Mackall,* 138 Md. 586, 114 A. 580 (1921); *Weddle v. School Commissioners, supra.* It follows, and we so hold, that sovereign immunity is a valid defense against a suit brought for a money judgment in assumpsit under the contract here against the Board unless funds have been appropriated for the payment of such damages as may be awarded, or the Board is authorized to raise funds for that purpose."

*Ruff,* 278 Md. at 590–91, 366 A.2d at 366. The *Ruff* Court went on to hold that the Board of Trustees of Howard County

Community College did not have the power to provide funds by taxation, but remanded the case to hear arguments on whether funds had been appropriated for the purpose of satisfying a monetary judgment arising out of the underlying construction contract in that case.

In the case *sub judice*, appellants also argue that § 12–104(b)(3), which authorizes the Board of Regents to "[s]ue and be sued," and the language in *Frankel* stating that § 12–104(b)(3) "waives any governmental immunity in declaratory judgment and contract actions to recover tuition overcharges," waives the Board's sovereign immunity in all contract cases falling within the scope of the Board's duties and obligations. Appellants cite the Education Article of the Maryland Code to assert that the Board of Regents has extensive powers, including the right to "[e]xercise all the corporate powers granted Maryland corporations under the Maryland General Corporation Law," pursuant to § 12–104(b)(1) (alteration added), and the rights to "[e]nter into contracts of any kind," pursuant to § 12–104(b)(5) (alteration added). Appellants cite § 10–208(5) of the Education Article for the Board of Regents' power to "set guidelines for tuition and mandatory fees." Appellants argue that these provisions of the Education Article illustrate that mid-year tuition increases fall within the scope of the Board's official duties and, because *Frankel*, 361 Md. at 309–10, 761 A.2d at 330 (internal citations omitted), states that "sue and be sued" language "does waive immunity in actions concerning matters within the scope of the governmental agency's 'duties and obligations,'" that the "sue and be sued" provision of § 12–104(b)(3) waives the Board's sovereign immunity.

While we agree that § 12–104(b) is a specific legislative act that discusses the scope of the duties of the Board of Regents, including the setting of tuition, and may satisfy the first prong of the *Maas* and *Ruff* test, we nevertheless hold that even if the general "sue or be sued" language asserted by appellants was, by itself, a waiver of sovereign immunity, which we do not hold, appellants nonetheless did not satisfy their burden under the second prong of the *Maas* and *Ruff* test.

Appellants argue that the General Assembly specifically authorized some suits by enacting § 12–104(b)(3), with its "sue and be sued" language. Coupling this legislative consent to "sue and be sued" with the Board's authority to set tuition and to enter into contracts, the first prong of the *Maas* and *Ruff* test might be satisfied. *See Frankel*, 361 Md. at 309–10, 761 A.2d at 330; *see also Jackson v. Housing Opportunities Comm'n of Montgomery County*, 289 Md. 118, 124, 422 A.2d 376, 379 (1980) (holding that the first prong of the waiver test was satisfied under the circumstances of that case as the Legislature enacted a law allowing the housing authority to "sue and be sued"); *Katz, supra*, 284 Md. at 512–15, 397 A.2d at 1032–34 (holding that the Washington Suburban Sanitary District Code's language to "sue and be sued," under the circumstances there present, satisfied the first prong of the waiver test); *O & B, Inc. v. Maryland–Nat'l Capital Park & Planning Comm'n*, 279 Md. 459, 466–468, 369 A.2d 553, 557–558 (1977) (limiting the waiver of immunity of a "sue and be sued" provision to "actions as would be necessary to carry out the agency's purposes"); *Ruff*, 278 Md. at 590, 366 A.2d at 366 (holding that "sue and be sued" language may satisfy the first prong of the waiver test, but that even where such language may satisfy the first prong, immunity is waived only where funds have been appropriated for the purpose of satisfying the judgment, or the ability to raise those funds is given by the Legislature); *Lohr v. Upper Potomac River Comm'n*, 180 Md. 584, 588–89, 26 A.2d 547, 549–50 (1942) (holding that the "sue and be sued" language was a limited waiver of immunity in that the actions must be necessary to carry out the agency's purpose); *Weddle v. Board of County School Commissioners of Frederick County*, 94 Md. 334, 344, 51 A. 289, 291 (1902) (holding that "sue and be sued" language waives immunity "in respect to all matters within the scope of [the State actor's] duties and obligations," but that immunity cannot be waived where there is no power to raise funds to pay damages) (alteration added).

While the language in *Frankel* regarding the "sue and be sued" provision of § 12–104(b)(3) may, under some circum-

stances, waive the Board's sovereign immunity for actions within the scope of its authority, thus satisfying the first prong of the *Maas* and *Ruff* test, it does not eliminate the need for analysis under the second prong of that test. In *Frankel*, we did not formally discuss the second prong of the *Maas* and *Ruff* test, as we held that immunity was waived by the Legislature's granting of authority to the Board to create a refund policy and the Board's creation of its own refund policy. The discussion of the "sue and be sued" provision followed *Frankel's* discussion of the Board's tuition refund policy for reclassifications of residency for tuition purposes, a policy which we acknowledged under the specific circumstances of that case waived governmental immunity in and of itself. There was thus no need for this Court to determine whether funds had been appropriated for Mr. Frankel's refund, or whether the Board was authorized to raise funds to pay for the refund because of the existence of the Board's own refund policy.[12]

We reiterate that the factual circumstances in *Frankel* were very different than those in the case *sub judice*. In *Frankel*, if the student's proper classification was as a Maryland resident, he had overpaid his tuition, *i.e.*, paid more than was legally due, and there was an express statutory source and an express policy requiring a refund. In the case at bar, the issue is whether the new tuition sums are legally payable in the first instance, not whether there has been overpayment based on an improper residency classification. In the case *sub judice*, there is no refund policy that covers appellants' situation, therefore in attempting to determine the extent to which the holdings in *Frankel* apply in this case we must also examine and contrast the "policy issues" present in this case with the policy in *Frankel*, and even if we presume the policy issues are similar, we must investigate whether the Board is able to levy a tax to raise funds for the repayment of a mid-

12. In addition, the parties may have assumed that sufficient funds existed to refund the relatively small sum in that case, *i.e.*, difference between out-of-state and in-state tuition for one student. In either case, it appears that the issue was not raised by the parties in *Frankel*.

year tuition increase of the scope here present or whether money has been appropriated and is available for the purpose of claims regarding the cumulative substantial tuition increases. The "policy" issue in *Frankel* was a legislatively authorized Board of Regents policy where the appropriation of funds was presumed by the parties and the Court to exist. The policy issue in the current case is whether the Board can legally impose a tuition increase, and whether the process of registration constitutes an express written contract signed by an authorized person, which might constitute a waiver of immunity, which, in turn, would make the increased tuition ***not*** legally payable. The issue is thus different than the issue resolved in *Frankel.*

It is clear that no statutory authority exists to authorize the Board of Regents to levy a tax for the purpose of repaying "illegal" mid-year tuition increases, so, under the *Frankel* scenario, even if it were applicable, the determinative issue then would be whether money has been appropriated for the payment of damages arising from claims such as appellants' claims in the case *sub judice.* The General Assembly is cognizant of how to specifically authorize the power to raise funds in satisfaction of the second prong of the *Mass* and *Ruff* test, as it has enacted a power to appropriate funds for the purpose of paying judgments arising from an express legislative waiver of immunity in Md.Code (1984, 1999 Repl.Vol.), § 12–203 of the State Government Article. Section 12–203 states that to fund damages arising out of actions based on § 12–201 of the State Government Article, discussed *infra,* "the Governor shall include in the budget bill money that is adequate to satisfy a final judgment that ... is rendered against the State or any of its officers or units." No such language appears in Title 12 of the Education Article and the parties have not directed us to any other such legislative authority applicable in the circumstances of this case.

In *Maas,* after holding that the University of Maryland was a State entity and that the Laws of 1812 (chapter 159), declaring that the University "be able in law to sue and to be sued," might waive the University's sovereign immunity, this

Court, nevertheless, held that the suit claims against the University could not proceed. We stated:

"In the case of *Williams v. Fitzhugh,* 147 Md. 384, 128 A. 137, suit was brought against the Board of Trustees of the State Normal School by one of the teachers for damages for an alleged breach of contract of employment. The right to maintain this suit was denied on the ground that the Board of Trustees had no means of 'procuring funds beyond the amount it receives from the state treasury under budget appropriations by the General Assembly for specific uses.' To the same effect is the case of *Fisher & Carozza Bros. Co. v. Mackall,* 138 Md. 586, 114 A. 580 and *Stanley v. Mellor,* 168 Md. 465, 178 A. 106.

"The decisions in this state go further than holding that without legislative sanction an arm of the state government, such as the University of Maryland, may not be sued, and are to the effect that, even though there is a legislative authorization to sue, such suits may not be maintained unless funds are available or may be made available by the agency itself for the purpose of paying the claim for damages that may be established by the suit. And this is supported by the case of *Fisher & Carozza Bros. Co. v. Mackall, supra.* This court there said, quoting from *Weddle v. School Commissioners,* 94 Md. 334, 51 A. 289, and approving this doctrine as laid down in *State v. Rich, supra,* that, 'notwithstanding the statute authorized a suit by or against a board of county school commissioners, the court held that the board was not liable in an action of tort because it had no power "to raise money for the purpose of paying damages." ' This doctrine, as applied to actions in tort, is extended to actions in contract in the case of *Williams v. Fitzhugh, supra.*

"So it is established that neither in contract nor tort can a suit be maintained against a governmental agency, first, where specific legislative authority has not been given, second, even though such authority is given, if there are no funds available for the satisfaction of the judgment, or no

power reposed in the agency for the raising of funds necessary to satisfy a recovery against it.

. . .

"Under the Laws of 1916, chapter 372, the State College of Agriculture was declared to be 'capable in law of suing and being sued' (section 1), and the University of Maryland, under the Laws of 1812 (chapter 159) was declared to 'be able in law to sue and to be sued, plead and interplead, answer and be answered, in any Court or Courts, before any judge or judges within the State, and elsewhere, in all manner of suits, pleas, cases and demands of whatever kind, nature or form that may be, and to do all and every other matter and thing hereby contemplated to be done, in as full and effectual a manner as any other person or persons, bodies corporate or public in like cases can or may do.' Thus was the University of Maryland by legislative enactments rendered liable to be sued, but even so, this does not fully satisfy the requirements of the rule, because it is definitely alleged and clearly shown that *the University of Maryland has only such funds as are appropriated for its use by the Legislature of Maryland, to be distributed by another arm of the state government, namely, the Comptroller and Treasurer of the State, for definite and limited purposes, nor has the University of Maryland power or authority, in itself, to raise moneys for the payment of damages.*"

*Maas,* 173 Md. at 558–60, 197 A. at 125–26 (emphasis added). *See Katz,* 284 Md. at 512–15, 397 A.2d at 1032–34 (holding that immunity was only waived due to the statutory provision authorizing the State agency "to certify a tax rate sufficient to produce funds to satisfy a judgment rendered against it," where the "sue and be sued" provision satisfied the first prong of the waiver test); *Weddle,* 94 Md. at 344, 51 A. at 291 (holding that while "sue and be sued" language may waive immunity "in respect to all matters within the scope of [the State actor's] duties and obligations," immunity is not waived where there is no power to raise funds to pay damages and

statutory language "provides that the school fund of the State shall be kept inviolate and appropriated only to the purposes of education"); *see also Kim, supra,* 353 Md. at 332–34, 726 A.2d at 248–49.

Similarly, in the case *sub judice,* appellants offer no evidence of whether sufficient, or even any, funds were appropriated for the purpose of satisfying adverse judgments based on claims or disputes relating to general tuition increases. The only evidence offered by appellants in this regard is a financial statement entitled "Balance Sheet" dated June 30, 2002. The data shown in that statement does not address how the potential funds listed are to be appropriated or spent. At oral argument, appellants' counsel argued that the "cash and cash equivalents" listed on the financial statement satisfied appellants' burden to show that funds were appropriated for the purpose of paying a judgment in its favor. We disagree.

Not only is this financial statement one assessing the assets of the University System as a whole and apparently not just for the institutions imposing the mid-year tuition increase, it is dated prior to the major budgetary cuts made by the Governor, cuts which are at the heart of the need to raise tuition mid-year in the first instance. In addition, the emphasized language from the next above excerpt from this Court's *Maas* decision illustrates that there have long been serious limitations and outside controls placed on the distribution of funds of the University of Maryland.

The "sue or be sued" language of § 12–104(b)(3) does not waive sovereign immunity for appellants' claims against the Board in the absence of proof that the necessary appropriations, or authority to tax, exists. Appellants had the burden to establish the requisite appropriations or taxing authority. They failed to meet that burden. Moreover, *Frankel* was a narrowly limited case involving residency reclassifications where statutory authorized refund policies existed. It is limited to its, and similar, contexts.

## B. § 12–201

■ As we have held that the *Frankel* case and § 12–104(b)(3) of the Education Article do not serve to waive the Board's sovereign immunity, we now address the question of whether Md.Code (1984, 1999 Repl.Vol.), § 12–201(a) of the State Government Article (§ 12–201(a)) waives immunity in this case. Section 12–201, in its entirety, states:

" **§ 12–201. Sovereign immunity defense barred.**

(a) Except as otherwise expressly provided by a law of the State, the State, its officers, and its units may not raise the defense of sovereign immunity in a contract action, in a court of the State, *based on a written contract that an official or employee executed for the State* or 1 of its units while the official or employee was acting within the scope of the authority of the official or employee.

(b) In an action under this subtitle, the State and its officers and units shall have the immunity from liability described under § 5–522(d) of the Courts and Judicial Proceedings Article." [Emphasis added.]

Appellants' argument that § 12–201(a) applies to situations as in the case *sub judice* fails, as the agreement between the parties here does not fit within the narrow definition of a "written contract that an official or employee executed for the State or 1 of its units while the official or employee was acting within the scope of the authority of the official or employee." We have long held that courts should not "either directly or by necessary implication" dilute the doctrine of sovereign immunity by "judicial fiat." *ARA Health*, 344 Md. at 92, 685 A.2d at 438; *see also Welsh*, 308 Md. at 59, 521 A.2d at 315 and cases therein cited; *Dunne v. State*, 162 Md. 274, 159 A. 751, *appeal dismissed and cert. denied*, 287 U.S. 564, 53 S.Ct. 23, 77 L.Ed. 497 (1932).

Appellants contend that they have an express written contract, encompassing several written documents, with the Board and that those documents need not be signed to be executed within the meaning of § 12–201(a). At oral argument, appellants' counsel argued that the bill sent to students

after the students had registered constituted the specific writing that had been executed by a State official acting within his or her scope of authority. They also contend that normal contract principles allow an express contract to consist of more than one document and does not even need to be in writing. They add that a contract can be executed without being signed. The Board counters by arguing that the plain language of § 12–201(a) requires a written contract and an execution of that contract by a person with the proper authority, which is satisfied only with a signature.

We agree with the Board's narrow interpretation of § 12–201(a), as we will construe legislative dilution of governmental immunity narrowly in order to avoid weakening the doctrine of sovereign immunity by judicial fiat. We have long recognized that "the cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *Holbrook v. State*, 364 Md. 354, 364, 772 A.2d 1240, 1245–46 (2001) (quoting *In re Anthony R.*, 362 Md. 51, 57, 763 A.2d 136, 139 (2000) (internal citation omitted)). As a first step, a court should thoroughly examine the plain language of the statute when attempting to ascertain the Legislature's intentions. *Holbrook*, 364 Md. at 364, 772 A.2d at 1246; *In re Anthony R.*, 362 Md. at 57, 763 A.2d at 139. The Court, when possible, "will give effect to the statute as it is written," where the statutory language in question has an unambiguous plain meaning. *Pak v. Hoang*, 378 Md. 315, 323, 835 A.2d 1185, 1189 (2003) (quoting *Moore v. Miley*, 372 Md. 663, 677, 814 A.2d 557, 566 (2003) (internal citation omitted)). We, however, will not add or delete words from the statute, *Gillespie v. State*, 370 Md. 219, 222, 804 A.2d 426, 427 (2002), and we will look "beyond the statute's plain language in discerning the legislative intent" only where the statutory language is ambiguous. *Comptroller of the Treasury v. Clyde's of Chevy Chase, Inc.*, 377 Md. 471, 483, 833 A.2d 1014, 1021 (2003).

When read in a narrow light, as is the case for interpretations of legislative limitations on sovereign immunity, § 12–201(a) is clear and unambiguous. It requires that a waiver of

sovereign immunity exists only where it is "based on a *written contract* that an official or employee *executed* for the State" (emphasis added). A written contract is defined as one "whose terms have been reduced to writing." *Black's Law Dictionary* 327 (Bryan A. Garner ed., 7th ed., West 1999). *Black's Law Dictionary* goes on to quote from the Restatement (Second) of Contracts § 95 (1981) (citations omitted), stating:

> "Written contracts are also commonly signed, but a written contract may consist of an exchange of correspondence, of a letter written by the promisee and assented to by the promisor without signature, or even of a memorandum or printed document not signed by either party. *Statutes relating to written contracts are often expressly limited to contracts signed by one or both parties. Whether such a limitation is to be implied when not explicit depends on the purpose and context.*" [Emphasis added.]

As indicated above, the term "written contract," by itself, defines a completed agreement. As such, it was not necessary for the Legislature to use the word "executed" in the statute unless the term was a further limitation on the waiver of immunity. In the context of the statute, had "executed" not meant "signed," it would have been surplusage. Moreover, an "executed" contract is defined as a "contract that has been fully performed by both parties" or as a "signed contract." *Black's Law Dictionary* 321(Bryan A. Garner ed., 7th ed., West 1999). The term, "executed" is defined as "(Of a document) that has been signed." *Id.* at 589. *Black's Law Dictionary* supplemented its definition of "executed" with the following:

> " '[T]he term "executed" is a slippery word. Its use is to be avoided except when accompanied by explanation. . . . A contract is frequently said to be *executed* when the document has been signed, or has been signed, sealed, and delivered. Further, by executed contract is frequently meant one that has been fully performed by both parties.'

William R. Anson, *Principles of the Law of Contract* 26 n. * (Arthur L. Corbin ed., 3d Am. ed.1919)."

*Id.*

In the case *sub judice*, the interpretation of § 12–201(a), *i.e.*, a legislative limitation on sovereign immunity, must be viewed within the context of an unfavored limitation on a well-recognized and ancient doctrine with a strong public policy to insulate the State "from burdensome interference with its governmental functions and [preserve] its control over State agencies and funds." *Kim*, 353 Md. at 333, 726 A.2d at 248 (quoting *Katz*, 284 Md. at 507, 397 A.2d at 1030). Given that context, and the narrow definitions quoted above, we hold that the waiver language of § 12–201(a) requires a written contract signed by a person expressly authorized to execute the contract for the University System.

Here, appellants argue that the students' bill constitutes the writing that is dispositive of the Board's assent to a written contract. Even if that document is to be considered to constitute the written contract for the purposes of § 12–201(a), which we do not hold,[13] it was not signed for the purposes of § 12–201(a). At oral argument, appellants argued that our case of *Drury v. Young*, 58 Md. 546 (1882), which held that a printed letterhead on a memorandum was sufficient to satisfy the signature requirement of the statute of frauds, is analogous to the University System institutions sending appellants their bills printed with the institutions' seal. We disagree, because the context of the statute of frauds is signifi-

---

13. In fact, there are several documents involved in the alleged contract between these two parties. The January 8, 2003 letter informing the students of a possible mid-semester increase in tuition gave notice that the Board intended to exercise its authority to raise tuition, which was enumerated in several institutions' course catalogs and web sites, is another writing that contributes to the transaction at issue. In fact, the January 23, 2003 tuition increase and subsequent bill is another writing which is part of the same transaction. In any event, we need not consider the exact legal significance of each document or their relationship with each other because we hold that § 12–201(a) requires a signature. There is insufficient evidence that the bills in this case were signed for the purposes of § 12–201(a) by a person expressly authorized by the Board to execute contracts on its behalf.

cantly different than the context of the case at bar.[14] As we have said, we construe limitations on the doctrine of sovereign immunity narrowly. Here, we interpret § 12–201(a) to require a signature of a State official with the proper authority because of the statute's "executed" requirement. Letterhead, a school stamp or a school insignia on a document will not suffice to waive the defense of sovereign immunity under § 12–201(a); a signature of a duly authorized person is required. As the parties here did not have such a signed written contract sufficient to satisfy the requirements of § 12–201(a), the Board has not waived its sovereign immunity under that statute.[15]

## C. Declaratory and Injunctive Relief

Appellants contend, and the trial court found, that the Board could not raise sovereign immunity as a defense to appellants' claims for prospective declaratory and injunctive relief based on this Court's holdings in *Glover v. Glendening*, 376 Md. 142, 829 A.2d 532 (2003) and *Jackson v. Millstone*, 369 Md. 575, 801 A.2d 1034 (2002). The Board, in its cross-appeal from the trial court's finding on this matter, asserts that appellants' construction of those cases attempts to extend the holdings of those cases far beyond their intended scope.[16] We agree with the Board that extending the waiver of sover-

---

14. We have held that equity can impose a constructive trust, even where there has been no required compliance with the Statute of Frauds. Part performance can be an exception to the Statute of Frauds requirements. Certain admissions can take a matter out of the ambit of the Statute of Frauds. Such matters, generally, are not applicable in respect to the doctrine of sovereign immunity.

15. Nothing in this opinion is to be construed as applying so as to limit the application of Md.Code (1975, 2000 Repl.Vol., 2003 Supp.), Title 21 of the Commercial Law Article, "The Maryland Uniform Electronic Transactions Act," in appropriate cases. Apparently, that Act is not implicated in this case. Its application was not argued.

16. The Board also challenges whether appellants' claims are declaratory or injunctive at all. As we hold that sovereign immunity is not necessarily waived for all claims of declaratory or injunctive relief, including cases such as the one at bar, we need not address this last issue.

eign immunity to include all declaratory relief, where the unlawful implementation of, or failure to implement, a statute or regulation by a State official is not alleged, is not generally appropriate.

In *Glover, supra,* we held, relying on *Jackson, supra,* as being dispositive as to the sovereign immunity issue, that the defense of sovereign immunity is rejected in actions for declaratory or injunctive relief against state actors where the plaintiff claims that the state is acting in violation of a federal statute or regulation. *Glover,* 376 Md. at 147–50, 829 A.2d at 535–37. Specifically, in *Jackson,* we stated:

"Where a statute or regulation is invalid, sovereign immunity does not preclude a declaratory judgment action or suit for an injunction against the governmental official who is responsible for enforcing the statute or regulation. As Judge Delaplaine explained for the Court in *Davis v. State, supra,* 183 Md. at 389, 37 A.2d at 883, 'if a person is directly affected by a statute, there is no reason why he should not be permitted to obtain a judicial declaration that the statute is unconstitutional.' The Court in *Davis* went on to point out that, in addition, 'a court of equity has power to restrain the enforcement of a void statute or ordinance at the suit of a person injuriously affected.' *Ibid.* Specifically with regard to sovereign immunity, the *Davis* opinion held (183 Md. at 393, 37 A.2d at 885):

'Although a State may not be sued without its consent, an officer of the State acting under color of his official authority may be enjoined from enforcing a State law claimed to be repugnant to the State or Federal Constitution, even though such injunction may cause the State law to remain inoperative until the constitutional question is judicially determined.'

*See also, e.g., Police Com'r v. Siegel,* 223 Md. 110, 115, 162 A.2d 727, 729, *cert. denied,* 364 U.S. 909, 81 S.Ct. 273, 5 L.Ed.2d 225 (1960); *Pitts v. State Bd. of Examiners,* 222 Md. 224, 226, 160 A.2d 200, 201 (1960); *Pressman v. State Tax Commission,* 204 Md. 78, 84, 102 A.2d 821, 825 (1954),

and cases there cited; *Baltimore Police v. Cherkes*, 140 Md.App. 282, 309–310, 780 A.2d 410, 426–427 (2001).

"In addition, § 10–125 of the State Government Article specifically authorizes a declaratory judgment action to challenge the validity of a state administrative regulation, and the statute in subsection (c) expressly provides that '[t]he unit that adopted the regulation shall be made a party to the proceeding. . . .' Even if sovereign immunity were otherwise a defense to this type of action (and, as shown by the above-cited cases, it is not a defense), § 10–125 would constitute a waiver of such immunity."

*Jackson*, 369 Md. at 590–91, 801 A.2d at 1043. This language in *Glover* and *Jackson* clearly illustrates that our primary concern was to allow plaintiffs access to courts so they are able to challenge the legality of State laws and regulations, or the alleged unlawful implementation of such law and regulations by a State official. No language in those opinions suggests that a blanket waiver of sovereign immunity should be found to exist in respect to all declaratory relief sought against the State or a State official, especially where the stated claim is based upon an alleged contract, not an unlawful statute or an alleged illegal implementation of a State law or regulation. In the case *sub judice*, appellants do not claim that a statute is unlawful, nor do they claim that a State official is unlawfully applying a statute. They seek relief based solely upon an alleged tuition contract with the Board. As the cases of *Glover* and *Jackson* do not stand for the proposition that sovereign immunity is waived for all declaratory or injunctive relief sought, and the stated claim here does not challenge the legality of a statute or an official's implementation of a statute as in those cases, sovereign immunity is not waived.

### III. The Merits

While both parties urge the adoption of the holding in *Gamble v. University System of New Hampshire*, 136 N.H. 9, 610 A.2d 357 (1992) a case in respect to the merits, because we hold that the Board may avail itself of the defense of sovereign

immunity, thus barring appellants' claims, we need not reach the merits of appellants' first question presented relating to whether the Board breached a contract with appellants for the Spring 2003 semester's tuition.

## IV. Conclusion

We hold that the Board may avail itself of the defense of sovereign immunity in the case *sub judice*. Md.Code (1978, 2001 Repl.Vol.), § 12–104(b)(3) of the Education Article, which authorizes the Board of Regents to "[s]ue and be sued," does not waive sovereign immunity where the Legislature did not authorize a method of appropriating the funds for an adverse judgment. We additionally hold, and the trial court correctly found, that pursuant to Md.Code (1984, 1999 Repl.Vol.), § 12–201(a) of the State Government Article, the Board did not waive sovereign immunity because the contract was not signed by a duly authorized person. Finally, we reverse the trial court's finding that sovereign immunity is waived for all actions in which declaratory and/or injunctive relief is sought. To hold otherwise would improperly extend the *Glover* and *Jackson* cases. Accordingly, we affirm the order of the Circuit Court in part and reverse in part.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND REVERSED IN PART. COSTS TO BE PAID BY APPELLANTS.**

Dissenting Opinion by WILNER, J., which BELL, C.J., joins.

With respect, I dissent. I understand full well the financial dilemma that faced the Board of Regents when it was informed of the impending $36 million budget reduction on December 23, 2002. By the time the Board of Regents and the nine colleges opted to resolve that dilemma by increasing tuition for the spring semester, however, the University, through its colleges, had entered into clear written contracts with the students setting forth the fees that were to be charged for the spring semester, and the University, in my

view, is not permitted to deal with its financial problem by breaching those contracts.[1]

The core complaint of the students which to me, has merit is that, (1) through a combination of related documents, written contracts were entered into with the students, (2) the contracts were within the scope of Maryland Code, § 12–201 of the State Government Article, (3) the University has breached those contracts by raising the prices called for in the contracts, and (4) the University is precluded by § 12–201 from raising the defense of sovereign immunity to the students' claims for breach of contract. The University is not permitted to breach its contracts, and it remains liable for having done so.[2]

The real issue is whether the University, through its colleges, entered into express written contracts with the students, executed by an official or employee of the University acting within the scope of the person's authority. I believe that it did.

---

1. It is not for this Court, or any court, to second-guess the Executive decisions made by the Board of Regents as to how best to meet the financial crisis it faced. It should be noted, however, that the prospect of significant reductions in the University's budget was known to the Board as early as October, 2002. The University concedes in its brief that "[t]he likelihood of budget cuts to the University System of Maryland ('USM') was discussed at meetings of the USM presidents and Board of Regents in October and early November, 2002" and that "[v]arious cost containment actions, such as an expanded hiring freeze, staff furloughs, lay-offs, *tuition increases,* and deferral or cancellation of various operating expenses, were mentioned during these discussions." (Emphasis added). If the Board had even tentatively in mind exercising the authority reserved in its various catalogs to raise tuition for the spring semester, it could have alerted the students to that possibility long before January 8, 2003, and, if necessary, put a warning to that effect on the registration statements and bills. That would have avoided entirely any legitimate claim of breach of contract, as the students would have registered for the spring semester with that prospect in mind.

2. Although the contracts may have been with the individual colleges, I shall, for convenience, regard them as being with the University and treat the University in all respects as the contracting party.

A written contract can arise from several writings; it does not need to be on one piece of paper that all parties sign. As we held in *Rocks v. Brosius,* 241 Md. 612, 637, 217 A.2d 531, 545 (1966):

> "A contract need not be evidenced by a single instrument. Where several instruments are made a part of a single transaction they will all be read and construed together as evidencing the intention of the parties in regard to the single transaction. This is true even though the instruments were executed at different times and do not in terms refer to each other."

Thus, if A, in writing, advertises its willingness to sell widgets for $10/widget, and B, in response, offers in writing to purchase 100 widgets at that price, and A responds, in writing, that B's order for 100 widgets has been received and accepted, the parties have a written, enforceable, executory contract. A is required to deliver the widgets at the accepted price, and B is obligated to pay the $1,000. That is simple Hornbook contract law and is essentially what occurred here, although it was a service, rather than a product, that was offered and accepted at a set price.

I start with the fact that, after satisfying admission requirements, the plaintiffs were duly and formally admitted as students of the University and thus became eligible to register for courses offered by the University. The catalogs published by the University described the available courses with sufficient definiteness that both the University and the students knew what was being offered. The catalogs also informed the students of the tuition and other fees that would be charged. Those charges, the University concedes in its brief, were set by the Board of Regents. The catalogs constituted, in a contract sense, an invitation to the students to bid.

By formally registering for offered courses, in light of the quoted tuition and fees pertaining to such registration, the students did, indeed, bid. When their registrations were accepted by the University, in writing and on its official form, and bills were sent, in writing and on the University's official

form, showing the courses for which the students had registered and the amounts due by reason of that registration, written contracts arose. At that point, the students had a contractual right to attend those courses and, if completed successfully, to be given credit for them toward a degree. At that point, subject to its own policies regarding withdrawals, which formed part of the contract, the University had a contractual right to payment. A perfected and enforceable contract was then in place.

Brushing all this fundamental contract law aside, the Court denies relief essentially on four grounds: (1) the University reserved the right in its catalogs to change the quoted tuition and fees; (2) the contracts were implied, rather than express, ones and implied contracts are not within the ambit of § 12–201; (3) the contracts were not "executed" by an official or employee of the University, and (4) there are no funds to pay any refunds to the students. None of those grounds, in my view, has any merit.

It is true that, in its various catalogs, the University indicated that quoted tuition and fees were subject to change, although none of the catalogs suggested that changes could be made after registration was complete and bills had been sent and paid. At oral argument, the University noted that there was no time limit on when changes could be made and suggested that tuition could be increased even after the semester had started, and possibly after it ended. Under the University's theory, the University could raise tuition for the spring semester retroactively, at the end of May, and presumably deny the students course credit if the increased amount was not paid. I doubt that the Court, upon clear reflection, would approve of that, yet it follows inexorably from the Court's position that there is no enforceable contract.[3] I

---

3. Indeed, the Court's approach would allow even more egregious breaches. Suppose, instead of raising tuition after registration had been completed, the Board of Regents decided to deal with the financial crisis by shutting down Bowie State University or one of the Law Schools for the spring semester, but yet retain the tuition paid by the students for that semester. Would the Court hold that the students

would hold that the ability to increase tuition or fees ended when registration for the spring semester courses occurred and a bill for that semester was sent. That is when the contract was formed; that is when the ability to change its terms ended.

The Court does not explain, and I am at a loss to understand, why the contracts are implied, rather than express ones. In *County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000), we adopted the definition of "express contract" found in *Black's Law Dictionary* 323 (6th ed.1990): "an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing." We accepted as well the statement from *Klebe v. United States*, 263 U.S. 188, 192, 44 S.Ct. 58, 59, 68 L.Ed. 244, 247 (1923) that "[a] contract implied in fact is one inferred from the circumstances or acts of the parties; but an express contract speaks for itself and leaves no place for implications."

Under those definitions, I would hold the contracts here to be express ones. No term is missing or left to implication; no agreement is left to implication. Through the acceptance of the registrations and the sending of the bills, the University has expressly committed itself to accept the students into the courses for which they registered at the prices stated on the bills. Nothing is left to extrinsic proof. The documents themselves, on their face, evidence the contracts and contain all of the necessary terms. If the University were to sue a student for non-payment of the fees, all it would have to produce to establish an express contract would be the registration form and the bill, and possibly the catalog.

The Court holds that the contracts were not signed by anyone, and, for that reason, do not fall within the ambit of § 12–201. The statute does not require an actual signature by

---

could not recover their tuition because of the University's sovereign immunity—that there was no enforceable contract? If not, how would the Court distinguish that circumstance from the one now before us?

anyone, but only that the contract be "executed for the State" by an authorized official or employee. In *Porter v. General Boiler Casing Co.*, 284 Md. 402, 410, 396 A.2d 1090, 1095 (1979), we held, explicitly, that "a signature is not required in order to bring a contract into existence, *nor is a signature always necessary to the execution of a written contract.* The purpose of a signature is to demonstrate 'mutuality or assent' which could as well be shown by the conduct of the parties." (Emphasis added). Quoting 1 A. Corbin, *Contracts* § 31 at 114 (1963), we added that, at common law, the making of a valid contract did not require a writing at all, "and even if there is a writing, there need be no signatures unless the parties have made them necessary at the time they expressed their assent and as a condition modifying that assent." *Porter, supra*, at 410–11, 396 A.2d at 1095.

I recognize that the waiver of the State's sovereign immunity in breach of contract actions was a somewhat limited one, in that the Legislature attached a number of conditions to it, and that the Court should not extend that waiver beyond what was expressed by the Legislature. It is clear from the legislative history of § 12–201, however, that the waiver was intended to be remedial in nature (*see Baltimore County v. RTKL Associates*, 380 Md. 670, 846 A.2d 433)—to correct what the Legislature regarded as the injustice of allowing the State and its agencies, with impunity, to breach solemn contracts that they had made—so there needs to be some balance in interpretation. If the Legislature intended to restrict the waiver to contracts personally signed by someone in authority, it would have said so, but it did not say so. The University has never even suggested, much less argued, that any of the documents that, to me, form the contract, were not prepared and issued by officials or employees who were authorized to do so, and, in the absence of any evidence to that end, we may presume that they were so prepared and issued, especially as they are all on University forms, many containing the University or college seal.

Finally, as to the sovereign immunity issue, the University acknowledges, as it must, that the Legislature has authorized

it to be sued, not that such express authorization is any longer necessary with respect to contracts falling within the ambit of § 12–201. Section 12–203 of the State Government Article requires the Governor to place sufficient funds in the State budget to discharge the University's obligation. All of the necessary pieces, even under a *University of Maryland v. Maas* analysis, are thus in place. The Court briefly acknowledges the existence of § 12–203, but takes no account of it, noting only that no such provision appears in the Education Article of the Code. So what? No other statute is necessary.[4]

I would reverse the judgment of the Circuit Court and remand for further proceedings to formulate a judgment that would honor and enforce the contracts with the students.

Chief Judge Bell authorizes me to state that he joins in this dissent.

---

4. It is important to note that, when the complaint was filed, the predominant remedy sought was injunctive relief to preclude the University from charging the extra fees. Had that relief been granted, as it should have been, prior to the students being forced to pay the extra tuition, no monetary judgment, or, at worst, a limited one, would have been necessary and the issue of available appropriations to pay any judgment would probably not have arisen. In any event, as to those students who have since paid the extra tuition, § 12–203 requires the Governor to include in the budget bill money that is adequate to satisfy final judgments. *See* Maryland Constitution, Art. III, § 52(4) and (12). Even if that is done in succeeding years, as necessarily it must at this point, there will be funds available to discharge any judgments.